CORL v HURON CASTINGS, INC

Docket No. 98054. Argued October 10, 1995 (Calendar No. 1). Decided March 1, 1996.

William L. Corl brought a wrongful discharge action in the Huron Circuit Court against Huron Castings, Inc. The parties stipulated the amount of damages, reflecting a reduction for unemployment compensation benefits received, and that if the plaintiff prevailed the trial judge would determine whether the award could be enhanced by the amount of the benefits. The court, M. Richard Knoblock, J., found that the plaintiff was wrongfully discharged in violation of *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579 (1980), entered judgment following a jury verdict for the plaintiff, and, on the basis of *Pennington v Whiting Tubular Products, Inc,* 370 Mich 590 (1963), added the unemployment compensation benefits as stipulated. The Court of Appeals, SHEPHERD, P.J., and McDONALD and NEFF, JJ., affirmed in an unpublished memorandum opinion (Docket No. 140650). The defendant appeals.

In an opinion by Justice RILEY, joined by Chief Justice BRICKLEY, and Justices MALLETT and WEAVER, the Supreme Court *held:*

The collateral source rule is a tort law concept and does not apply in cases of common-law contract. In accordance with accepted principles of contract law, the plaintiff's damage award must be reduced by the amount of unemployment compensation received.

1. The collateral source rule is a concept of tort law, providing that recovery of damages from a tortfeasor is not to be reduced by a plaintiff's receipt of compensation for injuries from other sources. In this case, however, the plaintiff's cause of action does not arise in ,tort; rather, it is a wrongful discharge action sounding in and governed by principles of common-law contract. Thus, the collateral source rule does not apply.

2. The Worker's Disability Compensation Act compensates for wage loss. MCL 418.358; MSA 17.237(358) prevents duplication of worker's compensation awards and unemployment compensation benefits and, thus, undermines the relevant language of *Pennington. Pennington* involved a breach of a collective

bargaining agreement; therefore, its reliance on a tort action for personal injuries is misplaced. The language in *Pennington* supporting the deduction of unemployment compensation benefits is dicta.

3. The Legislature has developed a complex formula for the funding of unemployment compensation benefits. An employer's liability to pay unemployment compensation arises, in part, in proportion to the amount its former employees receive in unemployment compensation benefits. In this manner an employer is ultimately responsible for its employees' unemployment compensation claims. The extension of the collateral source rule to the area of contract law would serve no public policy goals.

Reversed and remanded.

Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that the doctrine of legislative acquiescence is well established as a wisely self-imposed limitation of the appellate process. It is grounded in the court's duty to ascertain and give effect to the legislative intent and the presumption that, when revising or amending a statute, the Legislature is aware of previous interpretations of that statute by the appellate judiciary. Failure to revise provisions previously construed by the appellate judiciary compels the assumption that the Legislature was content with such construction.

The conclusion of the Supreme Court in *Pennington* regarding the propriety of deducting unemployment benefits from ultimate damage awards was stated with the intent that it be heeded by the trial court on remand. The Legislature's conscious failure to express any disagreement with *Pennington* in its numerous revisions of the Employment Security Act gives rise to a paradigmatic situation for application of the legislative acquiescence doctrine. The judgment of the Court of Appeals in this case should be affirmed.

The remedy for breach of contract is to place the nonbreaching party in as good a position as if the contract had been fully performed. However, not all contracts are fungible for purposes of this remedy. The majority mistakenly believes that payment of wages is the sole consideration an employee receives from an employer under an employment contract. The purpose of the Employment Security Act is to combat the economic insecurity due to unemployment that manifests itself in terms of lost wages and other possible incidents of a layoff that may affect a worker at an earlier or later time. The Legislature knowingly chose not to require the setoff mandated by the majority. Recouping wages alone does not put an employee in as good a

position as if the employment contract had been fully performed.

Justice BOYLE, dissenting, stated that the Legislature's failure to provide for setoff of unemployment benefits requires application of the collateral source rule.

The issue in this case cannot be resolved by rote application of the distinction between contract and tort. Fundamentally, *Toussaint* is a fault-based doctrine, and its legitimate-expectations prong is an equitable principle not based on traditional contract analysis. Likewise, principles not grounded in traditional contract law have been associated with its implied-contract prong. *Toussaint* changed the common law, holding that personnel policies and practices could create a just-cause employment contract, even when no preemployment negotiations take place and there is no mutual assent on the subject of job security. It imposes a duty on employers to adhere to stated company policies and goals, and entitles plaintiffs to pursue a cause of action when employers breach this duty. *Toussaint's* sole ratio decidendi is that, in some circumstances, termination at will is unfair. Thus, rejection of the collateral source rule in this context cannot rest on a semantic distinction between fault-based causes of action and *Toussaint* claims. Because no consideration is given to collateral losses, manifestly no consideration need be given to collateral benefits that employees may have received.

Allowing a setoff of the entire amount of unemployment benefits received by the plaintiff in this case is an overcredit. Michigan employers do not pay into the unemployment benefits fund dollar for dollar what the employee takes out. Although in some sense paid for by the employer in the form of a tax, the unemployment benefits are not paid by the employer to the plaintiff, but, rather, are paid by the state out of state funds. To judicially approve a full deduction to the employer would be to grant more credit than is due and to preclude reimbursement of the fund. The nature of the claim does not dictate offset by the judiciary, and the Legislature's failure to do so indicates that it does not disapprove of *Pennington.*

*Berkley, Mengel & Vining, P.C.* (by *Christopher E. Mengel* and *Guy C. Vining*), for the plaintiff.

*Braun, Kendrick, Finkbeiner* (by *John A. Decker* and *Scott C. Strattard*) for the defendant.

RILEY, J. In this action for breach of employ-
ment contract, plaintiff employee was wrongfully
discharged in violation of *Toussaint v Blue Cross &
Blue Shield of Michigan,* 408 Mich 579; 292 NW2d
880 (1980). We are asked to decide whether
plaintiff's unemployment compensation benefits
should be deducted from his breach of contract
damage award. In accordance with accepted princi-
ples of contract law, we hold that plaintiff's unem-
ployment compensation benefits must be deducted
from his subsequent damage award. Moreover, we
conclude that this result best effectuates the intent
of the Legislature by preventing the duplication of
an employee's wage loss replacement. The judg-
ment of the Court of Appeals is reversed, and the
case is remanded to the trial court for entry of an
award consistent with this opinion.

I

Plaintiff William Corl was employed by defen-
dant Huron Castings in July 1981. He remained
an employee until he was terminated in May 1988.
After his termination, he filed a wrongful dis-
charge claim pursuant to *Toussaint, supra.*[1] Before
trial, the parties stipulated that plaintiff's dam-
ages were $16,500. This figure reflected a $6,200
deduction for unemployment compensation bene-
fits plaintiff had already received. The parties also
agreed that, in the event the jury returned a
verdict in favor of plaintiff, the trial judge would

---

[1] Plaintiff claimed that he had a legitimate expectation that he and
defendant had an employment contract that could only be terminated
for good cause. Accordingly, he alleged that his termination was
without good cause.

determine whether the award could be enhanced by $6,200.[2]

The case was tried before Judge Knoblock in the Huron Circuit Court. The jury returned a verdict for plaintiff, and, as stipulated, a judgment for $16,500 was entered. Plaintiff then petitioned the court to enhance the award by $6,200. Plaintiff argued that the unemployment compensation benefits were a collateral source and should be added to the contract damage award. On the basis of *Pennington v Whiting Tubular Products, Inc,* 370 Mich 590; 122 NW2d 692 (1963), the trial judge agreed and added the unemployment compensation benefits to the judgment. The judge conceded that the result was illogical, but felt obligated to follow *Pennington.*

Defendant appealed, and the Court of Appeals affirmed[3] in an unpublished memorandum opinion, explaining that although defendant's argument had some merit, it was likewise constrained to follow *Pennington.*[4] Defendant filed an application

[2] In other words, it was agreed that the total damages incurred by plaintiff were $22,700. However, defendant asserted that allowing recovery in that amount from the company would duplicate a portion of plaintiff's wage loss because he received unemployment compensation benefits. The parties disputed this issue, and it was, therefore, reserved for the trial judge to decide as a matter of law.

[3] Issued October 15, 1993 (Docket No. 140650).

[4] The Court of Appeals stated:

We find some merit to defendant's position that the unemployment benefits should be deducted from plaintiff's award of damages as wage loss benefits already received, especially in light of the Legislature's enactment of MCL 418.358; MSA 17.237(358), which indicates the Legislature's treatment of unemployment compensation as wage loss replacement. However, we are bound to follow *Pennington,* wherein our Supreme Court determined the payment of unemployment benefits is not to be construed as payment in lieu of wages, and thus can not be deducted from the amount of a damage award for lost wages. The circuit court did not err.

for leave to appeal. We granted leave[5] and now reverse the opinion of the Court of Appeals.

II

We are required to assess plaintiff's damages in this wrongful discharge action. Plaintiff pleaded and proved his case on the basis of *Toussaint*. In *Toussaint, supra* at 610, this Court stated: "We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to *rights enforceable in contract*." (Emphasis added.)[6] The remedy for breach of contract is to place the nonbreaching party in as good a position as if the contract had been fully performed.[7] Accordingly, the goal in contract law is not to punish

[5] 448 Mich 851 (1995).

[6] The Court further noted that "[t]he right to continued employment absent cause for termination may, thus, because of stated employer policies and established procedures, *be enforceable in contract* just as are rights so derived to bonuses, pensions and other forms of compensation as previously held by Michigan courts." *Id.* at 618-619 (emphasis added).

[7] In *Kewin v Massachusetts Mut Life Ins Co,* 409 Mich 401, 415; 295 NW2d 50 (1980), this Court held that damages generally are limited to "the monetary value of the contract had the breaching party fully performed under it." The rule has more universally been summarized as follows:

> One who commits a breach of contract must make compensation therefor to the injured party. In determining the amount of this compensation as the "damages" to be awarded, the aim in view is to put the injured party in as good a position as he would have had if performance had been rendered as promised. [5 Corbin, Contracts, § 992, p 5.]

The Court of Appeals has consistently articulated this maxim:

> The purpose of awarding damages in a breach of contract action is to place the injured party in as good a position as would have been enjoyed had the contract been fully performed. [*Om-El Export Co v Newcor, Inc,* 154 Mich App 471, 478; 398 NW2d 440 (1986).]

the breaching party, but to make the nonbreaching party whole.[8]

### A

Cognizant of these principles, we evaluate plaintiff's assertion that the collateral source rule allows full recovery from defendant notwithstanding the unemployment compensation benefits he received. The collateral source rule is a concept of tort law which provides "that the recovery of damages from a *tortfeasor* is not reduced by the plaintiff's receipt of money in compensation for his injuries from other sources." *Tebo v Havlik,* 418 Mich 350, 366; 343 NW2d 181 (1984) (emphasis added).[9]

In a unanimous decision by this Court in *Ferrett v General Motors Corp,* 438 Mich 235; 475 NW2d 243 (1991), we reaffirmed *Toussaint, supra,* holding that the plaintiff's cause of action was not in tort.[10] In *Ferrett, supra* at 239, the defendant brought an action for breach of contract and negli-

---

[8]  [O]ur system of contract remedies rejects, for the most part, compulsion of the promisor as a goal. It does not impose criminal penalties on one who refuses to perform his promise, nor does it generally require him to pay punitive damages. *Our system of contract remedies is not directed at compulsion of promisors to prevent breach; it is aimed, instead, at relief to promisees to redress breach.* Its preoccupation is not with the question: how can promisors be made to keep their promises? Its concern is with a different question: how can people be encouraged to deal with those who make promises? [Farnsworth, Contracts, § 12.1, p 812 (emphasis added).]

[9] See also *Nasser v Auto Club Ins Ass'n,* 435 Mich 33; 457 NW2d 637 (1990).

[10] This Court has distinguished between tort and contract actions as follows: " 'Where the cause of action arises merely from a breach of promise, the action is in contract. The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise.' " *Hart v Ludwig,* 347 Mich 559; 79 NW2d 895 (1956) (citing *Tuttle v Gilbert Mfg Co,* 145 Mass 169, 174-175; 13 NE 465 (1887).

gent evaluation after he was terminated for "excessive absenteeism." We declined "to recognize an action in tort for negligent evaluation," stating that an action could "be maintained, if at all, only for breach of a contractual obligation to evaluate." *Id.* at 242. Of importance to the present case, we then announced the underlying theory for refusal to recognize a claim in tort:

> "We have simply the violation of a promise to perform the agreement. The only duty, other than that voluntarily assumed in the contract to which the defendant was subject, was his duty to perform his promise in a careful and skillful manner without risk of harm to others, the violation of which is not alleged. *What we are left with is defendant's failure to complete his contracted-for performance. This is not a duty imposed by the law upon all, the violation of which gives rise to a tort action, but a duty arising out of the intentions of the parties themselves and owed only to those specific individuals to whom the promise runs. A tort action will not lie."* [Emphasis added.] [*Id.* at 243, citing *Hart v Ludwig,* 347 Mich 559, 565-566; 79 NW2d 895 (1956).]

Similarly, in the present case, we are confronted with an employer who impliedly contracted to terminate his employee for just cause.[11] The jury held that defendant failed to fulfill his duty. This duty, however, was not imposed upon "all," but

---

[11] In *Ferrett, supra* at 242, the Court stressed that the cause of action was in contract:

A duty in tort may arise out of a relationship. The asserted relationship here is a contract that was terminable at the will of either Ferrett or GM. Whether the contract was express or implied, *even if it included implied obligations arising out of policies set forth in the employee handbook,* the circuit court found that the employment contract did not give rise to enforceable obligations. [Emphasis added.]

only upon plaintiff, who impliedly contracted with defendant. Therefore, we conclude that defendant's liability does not arise in tort.[12]

In order for plaintiff to prevail, we must extend the collateral source rule to principles of contract law.[13] Significantly, however, plaintiff does not cite (nor have we been able to find) a single case involving breach of contract implementing the collateral source rule. Further, plaintiff's request is in direct conflict with the fundamental precept that the remedy for breach of contract focuses on making the nonbreaching party whole.[14] Consequently, cases relied on by plaintiff, such as *Motts v Michigan Cab Co,* 274 Mich 437; 264 NW 855 (1936),[15] involving tort liability, have no applica-

[12] Although it is difficult to affirmatively define a tort, "[i]t might be possible to define a tort by enumerating the things that it is not. It is not crime, *it is not breach of contract* . . . ." Prosser & Keeton, Torts (5th ed), § 1, p 2 (emphasis added).

[13] Indeed, plaintiff asserts that "[t]here is no reason not to apply the collateral source rule to both breach of employment contract and tort cases."

[14] Unlike contract law, "[o]ne factor affecting the development of tort law is the moral aspect of the defendant's conduct—the moral guilt or blame to be attached in the eyes of society to the defendant's acts, motives, and state of mind." Prosser & Keeton, n 12 *supra,* § 4, p 21. Cf. the objectives of contract remedies, n 7 *supra.*

[15] *Motts, supra* at 443-444, involved an action brought to recover damages for personal injuries sustained while the plaintiff was a passenger in a taxicab when it was struck by the defendant. The case is wholly distinguishable from the present breach of contract appeal:

> The prevailing doctrine in this country, however, is that when the salary or wages of an injured person is paid by his employer during the time he is unable to perform services by reason of his injuries, that such payment is no ground for mitigation or diminution of the damages to be paid by one who caused the injury. . . .
>
> This doctrine is evidently analogous to that followed generally throughout the courts of this country, that a recovery of damages for loss, injury or death, *from a tortfeasor,* is not barred by the receipt by the injured or his beneficiaries of money paid by an insurance company on an insurance policy for the same respective loss, injury or death. [Citations omitted; emphasis added.]

tion whatsoever to this case.[16] Thus, in the face of this Court's reluctance to extend tort remedies to cases pleaded and proven in contract, we elect to continue to distinguish between tort and contract remedies.[17]

B

The present case is also distinguishable from the federal cases on which plaintiff relies. In *NLRB v Gullett Gin Co,* 340 US 361; 71 S Ct 337; 95 L Ed 337 (1951), the United States Supreme Court refused to deduct unemployment compensation benefits from a breach of employment contract damage award. *Gullett* involved employees who were discharged in violation of the Labor Management Relations Act. Cognizant of its limited power to review, the Court upheld the National Labor Relations Board's refusal to deduct unemployment compensation benefits from the award.[18]

[16] Plaintiff's similar reliance on *Tebo, supra,* is also unwarranted because it, too, involved a collateral benefit that inured to a tortfeasor.

[17] In *Kewin,* n 7 *supra* at 420, this Court refused to award damages for mental distress and exemplary damages in a breach of contract action. In a cause of action pleaded and proven for breach of contract alone, the Court stated:

> In the commercial contract situation, unlike the tort and marriage contract actions, the injury which arises upon a breach is a financial one, susceptible of accurate pecuniary estimation. The wrong suffered by the plaintiff is the same, whether the breaching party acts with a completely innocent motive or in bad faith.

[18] With clear deference to the board's decision, the Court noted that the Labor Management Relations Act, 29 USC 141 *et seq.,* gave broad discretion to the board to effectuate the goals of the act. The Court stated:

> "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard

The NLRA requires that upon a finding of unfair labor practice, the NLRB must " 'take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act . . . .' " *Gullett, supra* at 362. In *Gullett, supra* at 364, the Court explained that allowing the employee to collect unemployment compensation from the State of Louisiana "may reasonably be considered to effectuate the policies of the Act." *Gullett* is distinguishable because it involved employees who were discriminatorily discharged. Thus, the Court merely held that it was within the NLRB's discretion to allow the discharged employees to collect unemployment compensation because it would effectuate the policies of that specific act.

The goals of and the policies surrounding the NLRA distinguish *Gullett* from the present case. In fact, upon finding an unfair labor practice, the board was obligated to "issue a cease and desist order requiring the *guilty party* 'to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the] Act . . . .' " *Id.* at 362 (emphasis added). However, here we address a case of wrongful discharge that gives rise to an action for breach of contract only. As such, we are unable to attribute "guilt" to one of the parties in the same manner as in *Gullett.*[19]

We are persuaded that *Gullett* is more accurately analyzed in conjunction with *United Protective Workers of America v Ford Motor Co,* 223 F2d 49 (CA 7, 1955). In *Ford,* the United States Court

against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." [*Id.* at 363, quoting *Phelps Dodge Corp v NLRB,* 313 US 177, 194; 61 S Ct 845; 85 L Ed 1271 (1941).]

[19] Cf. *Kewin,* n 7 *supra* at 441, n 16.

of Appeals for the Seventh Circuit held that Ford
Motor Company improperly required an employee
to retire. The trial judge reduced the employee's
damages by the amount of social security and
annuity payments he received between the period
in which he was wrongfully retired and the date
on which he was required to retire. The court
distinguished *Gullett,* stating that it *did not re-
quire* a deduction of unemployment compensation
benefits:

> The cases speak only of the National Labor
> Relations Board's power to award back pay under
> the Act without deductions of any amounts other
> than for wages or earnings received during the
> period. They are not decisive as to the propriety of
> deductions which should be made in determining
> the amount of damages in a common law action
> for damages for the breach of an employment
> contract. [*Ford, supra* at 53.]

The court correctly narrowed the focus of its
decision to the proper amount of damages for
breach of contract. The court noted that if the
employee had not been improperly required to
retire, he would not have received the social secu-
rity or annuity payments, and, therefore, if they
were not deducted, the employee would receive
"more than he would have if the contract had not
been breached." *Id.*

Perhaps more persuasive, the case was distin-
guished from an action sounding in tort that
would be subject to the collateral source rule. In
this regard the court held:

> We have been unable to find a single case in
> which this rule has been carried over to contract
> damages. In the absence of any binding precedent
> to the contrary we prefer to follow here the ordi-

nary contract measure of damages rather than the
rule in tort cases. [*Id.* at 54.]

Similarly, the present case is governed by princi-
ples of common-law contract. *Toussaint, supra.*
Thus, in contrast to *Gullett,* plaintiff's claim is not
governed by statute.[20]

### III

Plaintiff, relying on *Pennington, supra,* argues
that unemployment compensation benefits may
not be deducted from a contract damage award.
For this reason, a careful reevaluation of the
applicability and underlying integrity of *Penning-
ton* is necessary. We cautiously review this Court's
decision in *Pennington* mindful of stare decisis
principles:

> The rule of *stare decisis* establishes uniformity,
> certainty, and stability in the law, but it was
> never intended to perpetuate error or to prevent
> the consideration of rules of law to be applied to
> the ever-changing business, economic, and political
> life of a community. Only in the rare case when it
> is clearly apparent that an error has been made,
> or changing considerations result in injustice by
> the application of an outmoded rule, should we
> deviate from following the established rule. [*Par-
> ker v Port Huron Hosp,* 361 Mich 1, 10; 105 NW2d
> 1 (1960).][21]

---

[20] The present case is also distinguishable from title VII cases.
Plaintiff claims that the circumstances in *Rasimas v Michigan Dep't
of Mental Health,* 714 F2d 614 (CA 6, 1983), are "identical" to the
circumstances of the present case. We disagree. In title VII actions,
the court may order "any other equitable relief as the court deems
appropriate." 42 USC 2000e-5(g)(1). Similar to those cases governed by
the NLRA, title VII cases are a preemption of common-law contract.

[21] In *Parker,* this Court overruled previous decisions immunizing
charitable, nonprofit hospitals from liability for injuries caused by
negligent employees.

In *Pennington,* employees of a manufacturing company brought an action for breach of an employment contract. Whiting Tubular Products went out of business and was offered for sale. Two newly organized companies purchased Whiting, transferred Whiting's machinery to a new plant, and began operations shortly after Whiting shut down its operations.

The employees alleged that the two newly formed entities were organized in order to take over the business of Whiting, and that both companies were wholly controlled by Whiting who acted as a sales representative. The plaintiffs alleged that the reorganization was executed so that Whiting could avoid its obligations under its employment contracts.[22]

The primary issue on appeal involved the sufficiency of proof with regard to each claim.[23] However, the Court further held, in what may be characterized as dicta,[24] that it was .error for the trial judge to instruct the jury that payments received by the employee under the Employment

[22] Specifically, the employment contract stated: " 'It is understood that if the company changes the location of the present plant, employees on the seniority list shall be given the first opportunity to take a job at the new location.' " *Id.* at 594. The plaintiffs claimed that the reorganization, therefore, merely effected a change in the location of Whiting's operations and that the previously laid-off Whiting employees were entitled to employment at the new locations.

[23] After a verdict in favor of the plaintiffs, the judge granted a judgment notwithstanding the verdict in the defendant's favor because the measure of damages with respect to each employee had not been sufficiently proven. The Court held:

"The court finds that while 74 cases were consolidated into 1, that the measure of damages in each individual case should have been proven the same as if there were 74 individual suits filed in this court . . . ." [*Id.* at 597.]

This Court upheld the trial judge's ruling, stating that it was each plaintiff's obligation to establish entitlement to employment at the new locations.

[24] It was unnecessary to reach the issue of the propriety of the

Security Act, MCL 421.1 *et seq.*; MSA 17.501 *et seq.*, must be deducted from a damage award for breach of employment contract:

> We conclude . . . that the trial judge was in error in his direction to the jury. The purpose of the employment security act as set forth by the legislature in section 2 thereof indicates the object sought to be attained was the promotion of the public good and general welfare of the people of the State. There is nothing in the act to suggest that the payment of unemployment compensation is to be construed as in lieu of wages. [*Id.* at 600-601. Citations omitted.]

This language in *Pennington* was premised on the fact that the Legislature gave no indication whether unemployment compensation replaced wage loss.

However, the Legislature has subsequently manifested its intent to construe unemployment compensation as redress for wage loss.[25] In 1980, the Legislature enacted MCL 418.358; MSA 17.237(358),[26] which requires a worker's compensation award to "be reduced by 100% of the amount of benefits paid or payable to the injured employee

judge's instruction with regard to unemployment compensation deductions because the Court held that the verdict could not stand. The Court acknowledged this, stating: "Whether such course should be pursued under proper circumstances does not call for discussion at this time." *Id.* at 600.

[25] The dissent maintains that the Legislature has acquiesced to this Court's decision in *Pennington* through "conscious failure to express any disagreement . . . ." *Post* at 645. We disagree. *Pennington* based its decision on the fact that the Legislature failed to manifest an intent to construe unemployment compensation as in lieu of wages. By reducing a worker's compensation award by one hundred percent of unemployment benefits received, the Legislature has very clearly manifested its intent to treat the benefits as duplicative. In order to be duplicative, both benefits must compensate for wage loss and are therefore "to be construed as in lieu of wages." Thus, there has not been legislative acquiescence to *Pennington*.

[26] The statute was effective January 1, 1982.

under the Michigan employment security act . . . for identical periods of time and chargeable to the same employer."

It is clear that the Worker's Disability Compensation Act compensates for wage loss.[27] Cognizant that MCL 418.358; MSA 17.237(358) prevents duplication of worker's compensation awards and unemployment compensation benefits, a clear legislative intent to also characterize unemployment compensation as a wage-loss benefit emerges.[28] On

[27] In *Leizerman v First Flight Freight Service*, 424 Mich 463, 473-474; 381 NW2d 386 (1985), this Court held that Michigan law "only compensates for lost wages." See *Sobotka v Chrysler Corp*, 447 Mich 1, 6; 523 NW2d 454 (1994), in which Justice BOYLE stated that "[i]n Michigan, disability is wage loss."

[28] See *California Compensation Ins Co v Industrial Accident Comm*, 128 Cal App 2d 797, 807; 276 P2d 148 (1954), in which the California District Court of Appeal similarly held that the state's worker's compensation act and its unemployment insurance act both provide coverage for wage loss and are therefore duplicative:

> We fully recognize that an unemployed person, partially disabled by an industrial injury, may still be able to compete in the labor market, and thus may qualify for unemployment insurance benefits as one available for work. Although he may be covered by workmen's compensation, it may be preferable for him, if he is without funds, to apply for unemployment insurance, which he may obtain expeditiously, while his compensation claim is pending. But the subsequent compensation award, when made, as here, for temporary partial disability, is designed also to compensate the employee for the *very same loss of wages for which he has drawn unemployment insurance benefits.* Under such circumstances to permit an award of benefits under the workmen's compensation act for the same period during which unemployment insurance benefits have been received (and solely for the same loss of wages), without an adjustment in the award reflecting the amount of such benefits, would be incompatible with the principles underlying the structure of these statutes. . . . Otherwise, the result may often be the anomalous situation of public agencies providing the employee as much income, and on occasions more, during a period of idleness than he could earn if he were fully employed, so that it becomes to his advantage to remain away from work. This would distort the salutary purpose of the *wage-loss legislation* into a device whereunder a clever malingerer could reap the profit of cumulative benefits for a single loss of earnings. [Emphasis added; citations omitted.]

this basis, it appears that the Legislature's enactment of MCL 418.358; MSA 17.237(358) alone undermines *Pennington.*[29] We, therefore, find the present case to be squarely within the *Parker* decision justifying deviation from stare decisis.[30] Our conclusion is supported by our most recent pronouncement on this issue in *Drouillard v Stroh Brewery Co,* 449 Mich 293, 299; 536 NW2d 530 (1995): "Worker's compensation is one unit in a loosely connected system of wage-loss protection that also includes unemployment compensation . . . . "[31]

---

[29] The dissent apparently argues that it should be left to the Legislature to amend the unemployment compensation act. In this regard, the dissent's reliance on *Bartels v Ford Motor Co,* 292 Mich 40; 289 NW 322 (1939), is misleading. *Bartels* addressed the defendant's claim contesting its obligation to pay an employee disability for the same period the employee was receiving unemployment compensation benefits. However, both benefits in that case were statutory. Therefore, the proper remedy should have been left to the Legislature. In the present case, however, plaintiff's breach of contract damage award is a judicially created benefit. Accordingly, the remedy lies with the judiciary. It is wholly unnecessary for the Legislature to revise the unemployment compensation act to support this Court's holding. Reliance on the Legislature's coordination of worker's compensation and unemployment compensation benefits merely demonstrates that both are now construed as wage loss and are awarded "in lieu of wages." In this manner, the rule in *Pennington,* which was based on the opposite conclusion, is no longer supportable.

[30] See also *Sheppard v Michigan Nat'l Bank,* 348 Mich 577, 597; 83 NW2d 614 (1957), in which this Court held:

[C]ommon sense and sound judicial discretion (i.e. adherence to precedent) should not be transformed into an implacable tenet. . . . Where error is manifest and injustice rife, however, our course of action is clear.

[31] The Court also explained:

[W]age-loss legislation is designed to restore to employees a portion of wages lost because of three major causes of wage loss: physical disability, unemployment, and old age. The *crucial operative fact is that of wage loss* . . . . [B]efore coordination, it was not unusual for an employee to collect both unemployment and worker's compensation benefits at the same time. However, if an employee undergoes a period of wage loss, it

Finally, even assuming that *Pennington*'s holding in this regard is binding rather than mere dicta, its underpinnings remain suspect. In *Pennington,* the Court stated that an analogous issue was decided in *Kurta v Probelske,* 324 Mich 179, 188; 36 NW2d 889 (1949). *Kurta,* however, involved an action for personal injuries arising out of a pedestrian-vehicle collision. The Court upheld the plaintiff's damage award, concluding that it was not made excessive by the unemployment benefits the plaintiff received because it "in no way serve[d] to mitigate damages." In contrast, *Pennington* involved a breach of a collective bargaining agreement, which cannot be analogized to a tort action for personal injuries. We are persuaded that the relevant holding in *Pennington* is dicta and that in any event its underlying premise is no longer supported with regard to this issue.

IV

Finally, plaintiff urges that allowing a setoff for unemployment compensation benefits will result in a windfall for defendant. Review of MCL 421.19; MSA 17.520 assuages this concern. The Legislature

> does not follow that he should receive multiple wage-loss benefits simultaneously. An employee can experience only one wage loss and, in any logical or coherent system, should receive only one wage-loss benefit at any one time. [*Id.* (emphasis added).]

*Drouillard* is not, however, this Court's first pronouncement in this regard. We have previously recognized that the purpose of the Employment Security Act is to compensate for wage loss. On rehearing, this Court, affirming *General Motors Corp v Erves (On Rehearing),* 399 Mich 241, 260; 249 NW2d 41 (1976), stated in the lead opinion by Justice COLEMAN that the objective was "to compensate employes for loss of wages," and that "[a] literal and commonsense reading of the Employment Security Act dictates the finding that defendants are not entitled to back-to-work pay." Additionally, in *Koziol v Kelvinator, Inc,* 52 Mich App 391, 393; 217 NW2d 406 (1974), the Court of Appeals held that the "primary purpose of the Employment Security Act is to compensate workers for lost wages." *Koziol* citing *Erves, supra.*

has developed a complex formula for the funding of unemployment compensation benefits. In general terms, an employer's "contribution rate" is derived from three distinct sources: "a chargeable benefits component . . ., an account building component . . ., and a nonchargeable benefits component . . . ." MCL 421.19(2); MSA 17.520(2). The chargeable benefits component is a percentage derived by dividing "the total amount of benefits charged to the employer's experience account . . . by the amount of wages, subject to contributions, paid by the employer within the same period." MCL 421.19(3)(i); MSA 17.520(3)(i). Therefore, an employer's liability arises, in part, in proportion to the amount its former employees receive in unemployment compensation benefits. MCL 421.19; MSA 17.520. In this manner an employer is ultimately responsible for its employees' unemployment compensation claims.

Plaintiff disagrees with this analysis, arguing that the employer's costs are merely passed to the public through price increases and wage reductions.[32] Therefore, in order to avoid a windfall for defendant, plaintiff maintains that defendant should not be allowed to deduct unemployment compensation benefits. Plaintiff fails, however, to extend his assumption to its logical conclusion. According to plaintiff's analysis, we must also assume that any saving realized from deducting unemployment compensation benefits would be passed to consumers and employees.

Further, assuming that the public, in essence, subsidizes the unemployment compensation fund, a similar argument may be made that allowing

---

[32] During oral argument, defendant cited *Erves*, n 31 *supra* at 251, in support: "The costs involved are considered part of the cost of doing business and are reflected primarily in the price of the product to the consumer."

the employee the benefit of unemployment compensation and full damage recovery places the additional burden on the public. In other words, as an employer's responsibility to pay benefits increases, so does its contribution rate. In turn, the costs are passed to consumers and employees, i.e., to the public in proportion to the employer's liability. If anything, plaintiff's analysis persuades us that it will be the public, i.e., consumers and wage earners, who will ultimately be responsible for the enhancement of unemployment compensation benefits to plaintiff's damage award. Therefore, we are not persuaded by plaintiff's argument that our decision will negatively affect the public generally. Similarly, we are not convinced that extension of the collateral source rule to the area of contract law serves any public policy goals.

v

Thus, we conclude that plaintiff's damage award should be reduced by the amount he received in unemployment compensation benefits. This is a wrongful discharge action, and as such plaintiff's rights are enforceable in contract. *Toussaint, supra*. The collateral source rule does not apply in cases of common-law contract. The award to plaintiff should be in an amount equal to his total damages, reduced by any payments already received from the unemployment commission. The judgment of the Court of Appeals is reversed, and the case remanded for entry of an award consistent with this opinion.

BRICKLEY, C.J., and MALLETT and WEAVER, JJ., concurred with RILEY, J.

CAVANAGH, J. (*dissenting*). In overruling this

Court's previous decision in *Pennington v Whiting Tubular Products, Inc,* 370 Mich 590; 122 NW2d 692 (1963), the majority ignores the clear evidence of legislative acquiescence in that decision, thereby overstepping the appropriate constraints on our judicial function. Accordingly, I dissent.

I

The doctrine of legislative acquiescence is well established in our jurisprudence. See *McEvoy v City of Sault Ste Marie,* 136 Mich 172, 182-183; 98 NW 1006 (1904). We have characterized it as "a wisely self-imposed limitation of the appellate process." *Magreta v Ambassador Steel Co,* 380 Mich 513, 518; 158 NW2d 473 (1968). The doctrine is grounded in our "duty . . . to ascertain and give effect to the legislative intent" and the presumption that, when revising or amending a statute, the Legislature is aware of previous interpretations of that statute by the appellate judiciary. *Gwitt v Foss,* 230 Mich 8, 12; 203 NW 151 (1925); *Magreta, supra* at 519-520. The controlling precept of the doctrine is that when the Legislature amends or otherwise revises a statute, failure to revise provisions of that statute previously construed by the appellate judiciary compels our "assum[ption] that it was content with the construction which had been placed on th[ose] . . . provisions . . . ." *Gwitt, supra* at 12.

A

The majority attempts to undermine the authoritative effect of the *Pennington* decision by opining that the Court "held, in what may be characterized as dicta, that it was error for the trial judge to instruct the jury that payments received by the

employee under the Employment Security Act, MCL 421.1 *et seq.*; MSA 17.501 *et seq.,* must be deducted from a damage award for breach of employment contract . . . ." *Ante* at 633-634 (citing *Pennington, supra* at 600-601).

Dictum is defined as "an observation or remark . . . concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination; any statement of the law enunciated by the court merely by way of illustration, argument, analogy, or suggestion."[1] We have previously taken notice of the sage counsel of Justice Cardozo with regard to obiter dicta:

> "There is the constant need, as every law student knows, to separate the accidental and the non-essential from the essential and inherent." [*Breckon v Franklin Fuel Co,* 383 Mich 251, 270; 174 NW2d 836 (1970) (quoting Benjamin Cardozo, The Nature of the Judicial Process, pp 29, 30).]

Justice Cardozo's pragmatic standard is more logical and realistic than the distinction between holding and dictum employed by the majority, especially under the specific circumstances of the *Pennington* decision.

The majority opines that the *Pennington* Court's conclusion of law "that the trial judge was in error in his direction to the jury [that any unemployment compensation benefits received by the plaintiffs should be deducted from any damages award]," *id.* at 600, "was unnecessary . . . because the Court held that the verdict could not stand." *Ante* at 633-634, n 24. In my opinion, the majority ignores the true procedural context of the *Pen-*

[1] Black's Law Dictionary (6th ed), p 454.

*nington* decision, which, briefly, is as follows: Upon
conclusion of the trial, the jury returned a verdict
in favor of plaintiffs and awarded damages in an
aggregate amount. The plaintiffs' subsequent mo-
tion for entry of judgment on the jury verdict was
denied because the damages were not proved with
respect to each plaintiff. Consequently, the defen-
dant's motion for judgment notwithstanding the
verdict was granted, and judgment was entered in
the defendant's favor. *Pennington, supra* at 597-
598. On appeal, this Court held as follows:

> Judgment may not properly be entered on the
> verdict of the jury for the reasons stated. It is
> equally apparent that the judgment entered in
> circuit court in favor of defendants may result in
> injustice to at least some of these plaintiffs. With
> the thought in mind that such a result should be
> avoided if possible, this Court will exercise its
> inherent authority to grant the right to a new
> trial.
>
> The case is remanded with directions to set
> aside the judgment entered in defendants' favor,
> and for further proceedings in the trial court. [*Id.*
> at 603.]

Considered in its true context, then, it is obvious
that the *Pennington* Court's legal conclusion with
regard to the propriety of deducting unemploy-
ment benefits from the ultimate damages awards
was stated in anticipation of the remand for fur-
ther proceedings. The majority's narrow definition
of that holding denies us the authority to decide
legal questions that necessarily will be at issue in
the subsequent proceedings.

The majority's assertion that the *Pennington*
opinion "acknowledged" that it was unnecessary to
reach the issue whether unemployment benefits
should be deducted evidences a misapprehension of

that opinion. The majority relies on the following sentence, taken out of context:

> " 'Whether such course should be pursued under proper circumstances does not call for discussion at this time.' " [*Ante* at 634, n 24 (quoting *Pennington, supra* at 600).]

The "course" of action referred to was the plaintiffs' argument "that in the event of a decision by this Court that judgment should be entered on the verdict of the jury, the amount of such deductions should be added and this Court should order the entry of judgment in the increased amount." *Pennington, supra* at 600. The reason the *Pennington* Court did not need to discuss that suggested course of action was because "the report by the jury with reference to the awards of damages made to the individual plaintiffs receiving such made no mention of deductions, but it may be presumed that the direction of the court was followed." *Id.* As demonstrated above, the *Pennington* Court's legal determination that unemployment benefits need not be deducted from the ultimate damages awards was stated with the intent that it be heeded by the trial court on remand.

B

The majority further supports its attack on *Pennington* with defendant's argument that the Legislature's enactment of a setoff provision in the Worker's Disability Compensation Act[2] evinces "a clear legislative intent to also characterize unemployment compensation as a wage-loss benefit . . . . On this basis, it appears that the Legislature's enactment of MCL 418.358; MSA 17.237(358)

[2] MCL 418.358; MSA 17.237(358).

alone undermines *Pennington.*" *Ante* at 635-636. I strongly disagree.

This setoff provision provides that any benefits payable under the relevant provisions of the WDCA "shall be reduced by 100% of the amount of benefits paid or payable to the injured employee under the Michigan employment security act . . . ." MCL 418.358; MSA 17.237(358). The superficial appeal of the majority's reliance on this provision, however, does not survive close analysis.

In *Bartels v Ford Motor Co,* 292 Mich 40; 289 NW 322 (1939), this Court rejected the defendant's claim that it should not be required to make disability payments to the claimant for the period during which the claimant was also receiving unemployment compensation benefits. In rejecting the defendant's claim, this Court noted that "[t]he legislative intent was to set up two independent organizations for the administration of two kinds of compensation, payable from different funds or sources. . . . The contingency which has arisen in this case has come about by reason of the passage of the unemployment compensation act. *The remedy lies with the Legislature.*" *Id.* at 46 (emphasis added).[3] The *Bartels* opinion also cited this Court's opinion in *Henry v Ford Motor Co,* 291 Mich 535; 289 NW 244 (1939), with regard to the issue of the

[3] The majority characterizes my reliance on *Bartels* as "misleading" because *Bartels* dealt with two statutory benefits (unemployment and disability), whereas one of the benefits in the case at bar (damages for breach of contract) "is a judicially created benefit." *Ante,* p 636, n 29. Therefore, the majority concludes, "[i]n the present case, . . . the remedy lies with the judiciary." *Id.* Even assuming that this argument is theoretically sound (which I do not), it still is unavailing to the result sought by the majority because the question presented here is whether the statutory benefit (unemployment compensation) should be deducted from the breach-of-contract damages award. The focus is on what should be done with regard to the statutory benefit, and therefore the remedy lies with the Legislature. Accordingly, because the Legislature has shown that it knows how to require setoffs it deems necessary or proper, the majority's reasoning actually weighs in favor of the legislative acquiescence doctrine.

simultaneous receipt of unemployment benefits and worker's compensation benefits: "Both awards are purely statutory and, while there is no question about some incongruity in the provisions, nevertheless we are bound by the wording of the statutes. *The remedy is with the legislature* who alone can provide for deductions or denial of compensation under one act or the other." *Id.* at 541 (emphasis added). After these two decisions, the Legislature passed the setoff provision of the WDCA, which obviously resulted in *Bartels* and *Henry* no longer being good law.[4] Just as obviously, however, the Legislature has not taken similar action with regard to *Pennington,* even though that decision has been on the books for over thirty years. This conscious failure to express any disagreement with *Pennington* in any of the numerous revisions[5] of the Employment Security Act gives rise to a paradigmatic situation for application of the legislative acquiescence doctrine.[6]

The Employment Security Act also contains a

[4] I note, however, that we recently have stated unequivocally that "the underlying premise of *Bartels* remains valid . . . ." *Paschke v Retool Industries,* 445 Mich 502, 512; 519 NW2d 441 (1994). This underlying premise is "the distinct character and objectives of the two institutions [i.e., the worker's disability compensation system and the unemployment compensation system]." *Id.*

[5] A nonexhaustive survey of the Michigan Compiled Laws Annotated reveals that the Employment Security Act was revised at least once in each of the following years: 1965, 1966, 1967, 1970, 1971, 1974, 1975, 1976, 1977, 1978, 1980, 1982, 1983, 1989, 1992 and 1993.

[6] The majority claims that the setoff provision in the WDCA shows that "there has not been legislative acquiescence to *Pennington.*" *Ante,* p 634, n 25. The majority's focus, however, is too narrow. *Pennington* held that unemployment benefit payments need not be deducted from damage awards for breach of an employment contract, the same scenario presented in the instant case. Viewed in this context, the Legislature's subsequent action, mandating reduction of disability benefits by the amount of unemployment benefits, but declining to mandate a similar deduction from breach-of-employment-contract damages awards, compels the conclusion of legislative acquiescence to *Pennington.*

setoff provision, MCL 421.62(a); MSA 17.566(a), which, in relevant part, provides:

> If the commission determines that a person has obtained benefits to which the person is not entitled, the commission may recover a sum equal to the amount so received . . . .

This provision applies only in cases in which the beneficiary was not entitled to unemployment benefits in the first place, a situation clearly inapplicable to the case at bar. Even defendant concedes that this provision is inapplicable to this case.

In general, these two setoff provisions weigh heavily against judicial imposition of such a setoff in the case at bar because they provide unequivocal evidence that the Legislature is aware of the possibility of arguably overlapping benefits and knows how to correct those situations it feels are improper or unwise. And in light of this Court's recent affirmation of "the distinct character and objectives" of the worker's compensation and unemployment compensation systems, see *Paschke v Retool Industries,* 445 Mich 502, 511-512; 519 NW2d 441 (1994), the setoff provision of the WDCA is particularly persuasive evidence that the Legislature sees no need to reduce damage awards in wrongful discharge cases by the amount of unemployment compensation benefits received.

C

The majority's final attempt to discredit *Pennington* is the assertion that "its underpinnings remain suspect. In *Pennington,* the Court stated that an analogous issue was decided in *Kurta v*

*Probelske,* 324 Mich 179, 188; 36 NW2d 889 (1949). *Kurta,* however, involved an action for personal injuries arising out of a pedestrian-vehicle collision. . . . In contrast, *Pennington* involved a breach of a collective bargaining agreement, which cannot be analogized to a tort action for personal injuries." *Ante* at 637.

The majority apparently believes that the *Pennington* Court's reference to *Kurta* was inadvertent, that all eight members of this Court who joined the *Pennington* opinion were unaware that *Kurta* dealt with a personal injury claim. This belief, however, is gainsaid by the actual language of *Pennington:* "An analogous question was decided in *Kurta v Probelske,* 324 Mich 179, an action for damages for personal injuries . . . ." *Pennington* at 601. The *Pennington* Court's analogy to *Kurta* was conscious and deliberate.

The majority's substantive disagreement with this analogy must be based on the assumption that all contracts are fungible for purposes of fashioning a remedy for breach, that commercial contracts between merchants are representative of all contracts, and that tort and contract are totally discrete bodies of doctrine with no overlap whatsoever. This assumption is not supported by our case law.

In *Kewin v Massachusetts Mut Life Ins Co,* 409 Mich 401, 420; 295 NW2d 50 (1980), we expressly recognized the distinction between commercial contracts and marriage contracts and noted that "[t]here are exceptions to the general rule limiting the recovery for breach of contract." *Id.* at 415 (citing, inter alia, 5 Corbin, Contracts, § 1076, p 427). We also referred to "an exception recognized in *Stewart v Rudner,* 349 Mich 459; 84 NW2d 816 (1957)," which involved a contract between a doc-

tor and a patient.[7] *Kewin* at 415. I would not hold that an employment contract, even a just-cause employment contract, is identical to marriage contracts or doctor-patient contracts. But I would hold —indeed, I believe we could take judicial notice of the fact—that just-cause employment contracts entail greater expectations[8] by the parties, especially employees, than do run-of-the-mill commercial contracts between merchants.[9]

In my opinion, the *Pennington* Court purposefully established another exception, and did so in accord with the previously established principle that there are exceptions to the general, but not immutable, rule of recovery in breach-of-contract actions. Therefore, because of the clear evidence of legislative acquiescence in that decision, I would affirm the judgment of the Court of Appeals.

II

As a general consideration, the evidence of legislative acquiescence alone is sufficient to compel our continued application of the rule established in *Pennington*. However, the specific facts in this case also argue against the result reached by the majority.

The majority correctly notes that a breach-of-

---

[7] The exception discussed in these two cases was the propriety of allowing a claim for mental or emotional distress, a claim sounding in tort, in a breach-of-contract action. In addition to marriage and doctor-patient contracts, we acknowledged the propriety of the exception in regard to contracts of carriers and innkeepers with passengers and guests. *Kewin* at 415, n 1.

[8] These greater expectations are described in part II.

[9] This reasoning applies to just-cause employment contracts that arise from collective bargaining agreements or by implication under *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980), and its progeny. However, I consider this conclusion even more accurate in the context of an implied just-cause contract because of the high threshold established by the *Toussaint* line of cases.   .

employment-contract claim sounds in contract, as opposed to tort, and then notes the basic principle that the "remedy for breach of contract is to place the nonbreaching party in as good a position as if the contract had been fully performed." *Ante* at 625, n 7 (citing *Kewin, supra,* 409 Mich 415). Proper application of this principle, however, requires a proper determination of exactly what will place the nonbreaching party in as good a position as if the contract had been fully performed. The majority's analysis is premised on its mistaken belief that payment of wages is the sole consideration an employee receives from an employer pursuant to an employment contract.[10]

The legislative purpose of the Employment Security Act is to combat the "[e]conomic insecurity due to unemployment [that] is a serious menace to the health, morals, and welfare of the people of this state."[11] The majority apparently adopts defendant's express argument that "[l]oss of wages *is* the 'economic insecurity' created by unemployment." (Emphasis in original.) There are, however, other benefits provided to employees (e.g., life and health insurance, paid sick leave, pension contributions, etc.) that are part of the total employment package in addition to wages.[12] The economic insecurity resulting from unemployment manifests itself "in terms of lost wages [and] other possible incidents of a layoff which may affect a worker at an earlier or later point in time." *General Motors*

[10] This analysis includes all types of employment contracts: collective bargaining agreements, individually negotiated contracts, implied "just-cause" contracts, etc.

[11] MCL 421.2; MSA 17.502 (declaration of policy).

[12] The Employment Security Act provides that the term "wages" does not include amounts paid by an employer for insurance or annuities payable on account of an employee's retirement, sickness, or accidental disability; or for related medical or hospitalization expenses; or for moving expenses. See, generally, MCL 421.44(5); MSA 17.548(5).

*Corp v Erves,* 47 Mich App 591, 595; 209 NW2d 713 (1973).

## III

My colleagues in the majority apparently agree with the view of the circuit court and the Court of Appeals that the *Pennington* rule seems illogical, but, unlike those courts, feel they are not bound to accede to policy determinations made by the Legislature. Because of the unequivocal evidence that the Legislature knowingly has chosen not to require the setoff mandated by the majority, and because recouping wages alone does not put plaintiff in as good a position as he would have been had the employment contract been fully performed, I dissent.

LEVIN, J., concurred with CAVANAGH, J.

BOYLE, J. I respectfully dissent. I agree with the conclusion that the Legislature's failure to provide for a setoff of unemployment benefits requires application of the collateral source rule. Although I agree with Justice CAVANAGH's result, I write separately to state my reasons for joining in that conclusion.

As the majority recognizes, we have limited damages for the claim created in *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980), to those recoverable in contract. *Ante* at 625. However, I disagree that that limitation requires offset of the benefits in question. *Ante* at 630-631. The doctrinal foundation of the *Toussaint* claim is neither fish nor fowl, neither wholly contractual nor wholly fault-based. Thus, the answer to the question before us cannot be found in rote application of the distinction

between contract and tort.[1] Fundamentally, *Toussaint* is a fault-based doctrine. Indeed, we have now explicitly recognized that the "legitimate expectations" prong of the *Toussaint* doctrine is an equitable principle "not based on traditional contract analysis." *Rood v General Dynamics Corp,* 444 Mich 107, 137; 507 NW2d 591 (1993); *Bullock v Automobile Club of Michigan,* 432 Mich 472, 480; 444 NW2d 114 (1989); *In re Certified Question,* 432 Mich 438, 447-448; 443 NW2d 112 (1989). Likewise, principles that are not grounded in traditional contract law have been associated with *Toussaint's* "implied contract" prong. *Valentine v General American Credit, Inc,* 420 Mich 256, 263; 362 NW2d 628 (1984). While *Valentine* held that a *Toussaint* claim is an action for breach of contract and not a tort action, 420 Mich 259, it also stated:

> An employment contract will indeed often have a personal element. Employment is an important aspect of most persons' lives, and the breach of an employment contract may result in emotional distress. The primary purpose in forming such contracts, however, is economic and not to secure the

---

[1] Writing before the days of judicial expansion of protection against arbitrary discharge, McCormick recognized that a fundamental change may be impending and that

> [t]his might be worked out conceivably through the recognition of the willful and unjustifiable discharge of an employee, even though employed for an indefinite term, upon false charges or from inadequate reason, as a *tort,* for which emotional and punitive damages might be given. Short of that, the courts might expand their measure of compensation for breach of the employment *contract* by recognizing that deprivation of a job, if more than a casual one, not only affects usually a man's reputation and prestige, but ordinarily may so shake his sense of security as to inspire, even in men of firmness, deep fear and distress. It is a question of judicial statesmanship whether interests such as these should come to be recognized in measuring damages for wrongful discharge. [McCormick, Damages, § 163, pp 638-639 (emphasis in the original).]

protection of personal interests. The psychic satis-
faction of the employment is secondary. [420 Mich
263.]

At common law, employers could dismiss their
employees at will "for good cause, for no cause or
even for cause morally wrong, without being
thereby guilty of legal wrong." *Payne v Western &
A R Co,* 81 Tenn 507, 519-520 (1884). *Toussaint*
changed the common law, holding that personnel
policies and practices could create a just-cause
employment contract, even when no preemploy-
ment negotiations take place and there is no mu-
tual assent on the subject of job security. 408 Mich
613. *Toussaint* imposes a duty on employers to
"adhere[ ] to stated company policies and goals"
and entitles plaintiffs to pursue a cause of action
when employers breach this duty. 408 Mich 615.
Although we have characterized *Toussaint* as a
contract action for some purposes, we distort his-
tory if we fail to recognize that *Toussaint's* sole
ratio decidendi is that, in some circumstances,
termination at will is unfair. Thus, rejection of the
collateral source rule in this context cannot rest
on a semantic distinction between fault-based
causes of action and *Toussaint* claims.

Secondly, *Toussaint* claims involve a contract for
labor that may be fairly characterized as a judi-
cially created cousin to an unfair labor practice in
which the principle item of recovery is lost earn-
ings, *Valentine, supra.* While based on statute, it
has been recognized that unemployment benefits
are not earnings under the National Labor Rela-
tions Act, *Marshall Field & Co v NLRB,* 318 US
253; 63 S Ct 585; 87 L Ed 744 (1943), or under title
VII, which traces its damage roots to the labor act.
*Ford Motor Co v EEOC,* 458 US 219, 228-230; 102
S Ct 3057; 73 L Ed 2d 721 (1982). These remedies

are "make whole," not punitive. However, because no consideration is given to collateral losses, "manifestly no consideration need be given to collateral benefits which employees may have received." *NLRB v Gullett Gin Co,* 340 US 361, 364; 71 S Ct 337; 95 L Ed 337 (1951). Benefits paid by a third party are collateral benefits. *Id.* See, e.g., *Craig v Y & Y Snacks,* 721 F2d 77, 83 (CA 3, 1983) (title VII case); *Hayes v Trulock,* 51 Wash App 795, 804-805; 755 P2d 830 (1988) (wrongful discharge case).

Thirdly, allowing a setoff of the entire amount of unemployment benefits received by plaintiff is an overcredit. *Ante* at 637. Michigan employers do not pay into the unemployment benefits fund dollar for dollar what the employee takes out. As the majority accurately observes, "[t]he Legislature has developed a *complex formula* for the funding of unemployment compensation benefits." *Ante* at 637-638 (emphasis added). In addition, although in some sense paid for by the employer in the form of a tax, the unemployment benefits were not paid by the employer to the plaintiff, but, rather, were paid by the state out of state funds. To judicially approve a full deduction to the employer is to grant more credit than is due and to preclude reimbursement of the fund.

Finally, and most importantly, we have not been provided any information that would permit a satisfactory formulation of the true amount paid by the employer or appellate review of that finding. Thus, the amount deducted would be essentially arbitrary, a factor that has influenced courts denying the claimed offset. *Brown v A J Gerrard Mfg Co,* 715 F2d 1549, 1551 (CA 11, 1983) (en banc).

These observations do not suggest that the Legislature could not provide for a full or partial credit or for recoupment by the state. They do

suggest that the nature of the claim does not dictate offset by the judiciary and support my colleagues' conclusion that the Legislature's failure to do so indicates that it does not disapprove of *Pennington v Whiting Tubular Products, Inc,* 370 Mich 590; 122 NW2d 692 (1963).

The failure to amend the Employment Security Act, while amending the Worker's Disability Compensation Act[2] to require offset, may indicate a legislative conclusion that Michigan's rating formula for unemployment benefits is not readily translatable to the judicial forum. It may indicate that the Legislature has balanced the loss as a result of overpayment in the relatively rare instances of *Toussaint* recovery against the transitional costs to the administrative scheme and determined that the cost of recoupment by the fund[3] is not justified. In all events, the value of the credit and the entity to whom credit is due are questions peculiarly within the legislative sphere. The Legislature has not provided a setoff although it has corrected those overlapping benefits it perceives to be a problem. We are faced with a simple question: whether to permit a wronged party to retain recovery from a collateral source, or allow the party in the wrong a credit greater than that paid. I would affirm the decision of the Court of Appeals.

[2] MCL 418.358; MSA 17.237(358).

[3] Observing that authority refusing to reduce the employer's liability by the amount of unemployment benefits "seems correct," Professor Dobbs in his treatise says:

> Though the employee should not keep both the damages and the unemployment benefits the unemployment benefit fund should be allowed to recover its payment when full damages are paid. By holding that the employer gets no credit for unemployment benefits, the courts make such a recovery by the benefit fund possible. [Dobbs, Remedies, § 12.25, pp 925-926.]