RCO ENGINEERING, INC v ACR INDUSTRIES, INC

Docket No. 201436. Submitted January 12, 1999, at Detroit. Decided April 6, 1999, at 9:15 A.M. Leave to appeal sought.

RCO Engineering, Inc., brought an action in the Macomb Circuit Court against ACR Industries, Inc., and others, seeking recovery of response activity costs under the Michigan Environmental Response Act (MERA), MCL 299.601 *et seq.*; MSA 13.32(1) *et seq.*, for the cleanup of environmental contamination caused by a leaky underground storage tank. The defendants filed a countercomplaint in which they sought contribution, alleged that the plaintiff was solely responsible for remediation costs, and alleged that the plaintiff acted negligently in remediating the contamination. A jury found the defendants liable, but awarded nothing to the plaintiff, determining that the plaintiff did not establish that any response activity costs in excess of the amount it recovered from the Michigan Underground Storage Tank Financial Assurance Fund were necessary. The court, Lido V. Bucci, J., entered a judgment consistent with the verdict. The plaintiff appealed, and the defendants cross appealed.

The Court of Appeals *held*:

1. The trial court did not abuse its discretion in allowing the defendants to present evidence concerning the cost-effectiveness of two of the three types of cleanup delineated in the administrative rules that governed environmental contamination response activity at the time pertinent to this case, 1990 AACS, R 299.5701 *et seq.* Cost-effectiveness was relevant to the question whether the plaintiff had considered cost when choosing between the types of remedial action. Although the administrative rules left the choice of cleanup type to the person proposing the remedial action, they required the person to consider the costs of the alternatives when choosing among the cleanup types.

2. The trial court did not abuse its discretion in disallowing speculative testimony concerning the presence of contaminants other than those indicated by the soil test that was performed. The testimony would only have confused and misled the jury.

3. The trial court did not err in ruling that the collateral source rule does not apply to this case and that any recovery by the plain-

tiff from the defendants could be reduced by the payment received from the Michigan Underground Storage Tank Financial Assurance Fund. The collateral source rule is a concept of tort law and does not apply to this action brought under the MERA.

4. The trial court did not err in excluding evidence concerning the legal fees incurred by the plaintiff in seeking reimbursement from the Michigan Underground Storage Tank Financial Assurance Fund. The plaintiff sought to introduce the evidence in support of its argument that such reimbursement resulted in a common fund and that if the defendants are to benefit from the common fund, they have to share the burden of the legal fees incurred by the plaintiff. However, recovery of fees under the common fund rule is a recovery against allies, not adversaries like the parties in this case.

5. The trial court did not abuse its discretion in denying the plaintiff's motion for a mistrial. The motion was based on a comment made by a defense witness that he had sent a copy of a letter critical of the plaintiff's remediation efforts to a Michigan State Police investigator who was responsible for fraud involving the Michigan Underground Storage Tank Financial Assurance Act. Any potential prejudice from the comment was cured by a timely and strongly worded cautionary instruction by the trial court to the jury to disregard the comment.

6. The trial court did not abuse its discretion in excluding as speculative testimony that the cost of remediation would have been higher had the contaminated soil been treated as hazardous material instead of nonhazardous material.

7. The trial court did not abuse its discretion in denying the plaintiff's motion for judgment notwithstanding the verdict or a new trial. The motion was based on the issues that have now been resolved adversely to the plaintiff.

8. The trial court did not abuse its discretion in rejecting the plaintiff's proposed supplemental jury instructions. The proposed instructions were slanted and argumentative.

9. The trial court did not err with respect to the attorney fee component of the award of mediation sanctions to the defendants. The trial court completely and carefully examined the relevant factors for determining the reasonableness of attorney fees, MRPC 1.5(a). Because a court is bound by its written judgments, not by any colloquy it may have had with counsel, the trial court in this case was not bound by statements it made in open court concerning the award of fees for legal expenses incurred on matters other than damages.

10. The defendants' cross appeal need not be addressed in light of the disposition of the plaintiff's appeal.

Affirmed.

1. ENVIRONMENT — MICHIGAN ENVIRONMENTAL RESPONSE ACT — ADMINISTRATIVE RULES - TYPES OF CLEANUP — COSTS.

The administrative rules that governed environmental contamination response activity pursuant to the Michigan Environmental Response Act required a person who proposed remedial action to consider cost when choosing among three types of cleanup or any combination thereof (MCL 299.601 *et seq.*; MSA 13.32[1] *et seq.*; 1990 AACS, R 299.5701 *et seq.*).

2. TORTS — COLLATERAL SOURCE RULE.

The collateral source rule is a concept of tort law that provides that the recovery of damages from a tortfeasor is not reduced by the plaintiff's receipt of money from other sources in compensation for injuries resulting from the tort at issue.

3. WORDS AND PHRASES — COMMON FUND.

The common fund rule is predicated on the principle that those who share the fund would be unjustly enriched if they could take the benefit without the burden; recovery of fees under the common fund rule is a recovery against allies in an action, not adversaries.

4. JURY — NONSTANDARD JURY INSTRUCTIONS.

Supplemental jury instructions must correctly state the law and must be concise, understandable, conversational, unslanted, and nonargumentative (MCR 2.516[D][4]).

5. COURTS — JUDGMENTS.

A court is bound by its written judgments, not by any colloquy it may have had with counsel.

*Fraser Trebilcock Davis & Foster, P.C.* (by *Michael H. Perry* and *Thomas J. Waters*), for the plaintiff.

*Kotz, Sangster, Wysocki and Berg, P.C.* (by *Jeffrey M. Sangster* and *Robert T. Smith*) and *Kelley, Casey & Clark, P.C.* (by *Stephen M. Kelley* and *Bradford S. Moyer*), for the defendants.

Before: CAVANAGH, P.J., and HOLBROOK, JR., and WHITBECK, JJ.

HOLBROOK, JR., J. Plaintiff RCO Engineering, Inc., appeals as of right from the trial court's amended order of dismissal, which was entered following a jury trial. We affirm.

### I. BACKGROUND FACTS AND PROCEDURAL HISTORY

In 1968, defendant Roger W. Blanchard and others purchased some vacant property located in Roseville, Michigan. Facilities constructed on the property by a predecessor company to defendant ACR Industries, Inc., (hereinafter ACR) were used by ACR and its predecessor from 1968 until 1988. Both ACR and its predecessor manufactured aerospace equipment at these facilities. In 1968, ACR's predecessor placed a three thousand-gallon underground storage tank on the property. Petroleum products used by ACR during the manufacturing process were routinely dumped into the tank. ACR continued to use the tank until ACR moved from the property in 1988.

In 1987, Paul Carollo, a founder of plaintiff corporation, purchased the property from defendants Robert and Mary Kazmarek, and Blanchard. The property was then leased to plaintiff. In 1991, plaintiff began the process of removing the storage tank. In July of that year, plaintiff confirmed that there had been a release of hazardous substances from the tank. At the time, administrative rules promulgated by the Department of Natural Resources (DNR) under the then-current version of the Michigan Environmental Response Act (MERA), MCL 299.601 *et seq.*; MSA 13.32(1) *et seq.*,[1] identified three distinct types of

---

[1] All but two sections of the MERA were repealed by 1994 PA 451, effective March 30, 1995. The two other sections had previously been repealed

cleanup that could be done on a site contaminated by the discharge of hazardous substances. These cleanup types were labeled "Type A," "Type B," and "Type C." See 1990 AACS, R 299.5703(p) through (r);[2] 299.5707 through 299.5725.[3] Plaintiff chose to remediate the site using a Type A cleanup.

In January 1993, plaintiff brought suit against defendants under the MERA. Plaintiff alleged that ACR was liable for approximately $1.5 million in response activity costs[4] incurred in cleaning up contamination

---

by 1990 PA 234, § 2, effective July 1, 1991. All statutory references and quotations in this opinion are to the version of the MERA applicable at the time the case was litigated.

[2] Rule 299.5703 reads in pertinent part:

(p) "Type A" means the degree of cleanup which reduces hazardous substance concentrations such that those concentrations do not exceed background or method detection limits for a hazardous substance, consistent with the provisions of R 299.5707.

(q) "Type B" means the degree of cleanup which provides for hazardous substance concentrations that do not pose an unacceptable risk on the basis of standardized exposure assumptions and acceptable risk levels described in the provisions of R 299.5709 to R 299.5715.

(r) "Type C" means the degree of cleanup which provides for hazardous substance concentrations that do not pose an unacceptable risk, considering site-specific assessment of the risk as provided for in R 299.5717.

[3] Following the 1994 amendment of the MERA, the relevant administrative rules were significantly rewritten. One of these proposed revisions included the elimination of the Type A, Type B, and Type C cleanup categorization. This is in keeping with the new statutory scheme, which specifically identifies ten categories based on land use. MCL 324.20120a(1); MSA 13A.20120a(1). Appropriate cleanup criteria are now evaluated according to this land use scheme. *Id.* All references to and quotations from the administrative rules in this opinion are to the versions applicable at the time the case was litigated.

[4] " 'Response activity' means evaluation, interim response activity, remedial action, or the taking of other actions necessary to protect the public health, safety, or welfare, or the environment, or natural resources." MCL 299.603(aa); MSA 13.32(3)(aa).

of the property caused by the leaking of hazardous substances from the storage tank. Defendants filed a countercomplaint in which they (1) sought contribution for any remediation costs,[5] (2) alleged that plaintiff was liable for all costs because plaintiff was the owner of the storage tank at the time of the hazardous substance release, and (3) alleged that plaintiff acted negligently in remediating the contamination. At trial, the parties hotly contested the questions whether a Type A or Type B cleanup should have been used to remediate the site and whether the issue of cost should enter into any examination of the appropriate type of cleanup.

A jury found that although defendants were liable, plaintiff failed to establish that any response activity costs in excess of $990,000 were necessary. Given that plaintiff had already been reimbursed $990,000 by the state pursuant to the then-current version of the Michigan Underground Storage Tank Financial Assurance Act (MUSTFA), MCL 299.801 *et seq.*; MSA 13.29(201) *et seq.*,[6] plaintiff took nothing on its claim.[7]

---

[5] "Remedial action" includes, but is not limited to, cleanup, removal, containment, isolation, destruction, or treatment of a hazardous substance released or threatened to be released into the environment, monitoring, maintenance, or the taking of other actions that may be necessary to prevent, minimize, or mitigate injury to the public health, safety, or welfare, or to the environment. [MCL 299.603(y); MSA 13.32(3)(y).]

[6] At the time plaintiff was reimbursed, the MUSTFA allowed for a maximum reimbursement of $1 million. MCL 299.810; MSA 13.29(210). Further, pursuant to MCL 299.813; MSA 13.29(213), an applicant for MUSTFA funds was "responsible for the first $10,000.00 of corrective action or indemnification costs." Thus, plaintiff's $990,000 reimbursement was the maximum

## II. THE ISSUE OF COST-EFFECTIVENESS

Plaintiff argues that the trial court erred in allowing defendants to present evidence regarding whether a Type A or a Type B cleanup was most cost-effective given the circumstances. Defendants argue that the trial court's decision was proper. At its essence, the parties' dispute is one of timing. Both parties agree that the cost-effectiveness of any remedial action should be considered. They disagree, however, on just when cost should be considered in the course of choosing an appropriate remedial action. Plaintiff argues that cost should be considered only when evaluating the methods and technologies used to bring about the type of cleanup chosen. Plaintiff contends that according to the administrative rules, plaintiff had the unfettered authority to chose what type of cleanup it would pursue. Conversely, defendants argue that the administrative rules specifically state that the costs of alternative types of cleanups should be considered before a final determination is made concerning which type of cleanup will be employed.

Resolution of this dispute turns on an interpretation of the relevant administrative rules. "In construing administrative rules, courts apply principles of statutory construction." *Attorney General v Lake States Wood Preserving, Inc*, 199 Mich App 149, 155; 501 NW2d 213 (1993). Interpretation of administra-

---

allowed under the MUSTFA at the time. Sections 810 and 813 were subsequently repealed by 1994 PA 451, effective March 30, 1995.

[7] The original judgment in this case was issued on May 30, 1996. This Court dismissed plaintiff's original appeal from that judgment because the judgment did not address the third-party defendants and was therefore not a final order. The trial court remedied this defect in its February 4, 1997, amended order of dismissal.

tive rules is a question of law that is reviewed de novo on appeal. *Port Huron v Amoco Oil Co, Inc*, 229 Mich App 616, 624; 583 NW2d 215 (1998). The primary goal of judicial interpretation of administrative rules is to give effect to the intent of the author. *Id.*

> [I]f the agency's rule is clear and unambiguous, judicial interpretation is neither required nor permitted, and the court should not look beyond the ordinary meaning of the unambiguous language. If construction is warranted, we must construe the rule according to the common and approved usage of the language, resorting to dictionary definitions where appropriate. [*Lake States, supra* at 155 (citations omitted).]

As previously noted, the administrative rules delineate three separate types of cleanup, each recognized as fulfilling the directive that "the public health, safety, and welfare and the environment and natural resources" be protected. 1990 AACS, R 299.5705(1). Further, the rules recognize and promote the viability of alternative remedial action. For example, 1990 AACS, R 299.5513(2)(b) states that a feasibility study[8] shall develop "alternative final remedies that provide for a reduction in risk that is sufficient to meet the criteria set forth in part 7 of these rules." In fact, one recognized alternative remedy is the "[n]o action alternative." *Id.* at 2(a)(iii). The rules also recognize that an acceptable remedial action might be achieved by combining elements of the three types of cleanup alternatives. 1990 AACS, R 299.5705(3).

The rules also clearly indicate that cost must be considered when choosing between alternative reme-

---

[8] " 'Feasibility study' means a process for developing, evaluating, and selecting an appropriate remedial action." 1990 AACS, R 299.5101(i).

dial actions. For example, 1990 AACS, R 299.5513(3) states that the cost of remedial action "shall" be considered when an initial list of alternative remedies is being narrowed:

> An initial screening of alternatives to narrow the list of potential remedies for detailed evaluation in the feasibility study shall be conducted using all of the following broad criteria:
>
> *          *          *
>
> (b) Cost of the remedial action.

Rule 299.5601(3) also mandates that "[t]he cost of a remedial action shall be a factor only in choosing among alternatives which adequately protect the public health, safety, welfare and the environment and natural resources, consistent with part 7 of these rules." Further, 1990 AACS, R 299.5603(1)  states:

> In assessing remedial action alternatives, the department shall consider all of the following:
>
> *          *          *
>
> (f) Costs of remedial action, including long-term maintenance costs, except that costs shall only be considered as specified in R 299.5601(3).[9]

These rules recognize that a tension exists between conducting a cost-effectiveness analysis and the goal of remediating the contamination. In order to assure that the goal of remediation is not overwhelmed by concerns over cost, the rules make clear that (1) cost

---

[9] The consistent use of the imperative "shall" in each of these rules indicates that consideration of cost is mandatory. *Port Huron, supra* at 631.

must not be considered when a party initially comes up with a list of alternative types of remedial action and (2) each alternative proposed must "adequately protect the public health, safety, welfare and the environment and natural resources." 1990 AACS, R 299.5601(3). However, the rules also recognize that the goal of minimizing costs could be critically compromised if cost is not considered until after a final decision is made on the type of cleanup to be employed. Accordingly, the rules indicate that cost shall be considered when choosing between alternative types of remedial action, each of which must adequately address the problem. 1990 AACS, R 299.5513(3), R 299.5603(1)(f).

In other words, the rules strike a careful balance between the twin goals of effectively remediating the contamination and minimizing cost. Plaintiff's reading of the rules does not achieve a similar balance. If, as plaintiff suggests, cost could not be considered until after a cleanup type had been chosen, the goal of promoting cost-effective remediation would be undermined.

As plaintiff points out, 1990 AACS, R 299.5705(4) does state that "[t]he remedial action type proposed shall be at the option of the person proposing the remedial action." This does not mean, however, that the choice of remedial action cannot be challenged on the grounds of cost-effectiveness. Rule 299.5705(4) also states that the remedial action type chosen must "meet the applicable criteria set forth in this part and parts 5 and 6 of these rules." Thus, while the party proposing a remedial action has the discretion to pick the type of cleanup to be pursued, that party's choice

is governed by all the applicable rules, *including* the imperative that the cost of alternatives be considered.

Therefore, because the challenged evidence was relevant to the question whether plaintiff had properly considered cost when choosing its remedial action type, the trial court's admission of this material does not evidence an abuse of discretion. *Chmielewski v Xermac, Inc*, 457 Mich 593, 615; 580 NW2d 817 (1998).[10]

### III. PLAINTIFF'S PROPOSED TESTIMONY CONCERNING THE ABSENCE OF A LEACHABLE QUANTITY OF CONTAMINATION

Plaintiff next argues that by not allowing it to present testimony establishing that the lack of leachable contamination in a given soil sample does not mean that contamination is not present, the trial court allowed defendants to mislead the jury about the extent of the contamination. We disagree.

When questioning Michael Kurkowski, employed by plaintiff to help clean up the site, the following exchange took place between plaintiff's counsel and the witness:

> *Plaintiff's Counsel:* Okay, now, if you run a TCLP[11] test that's happened on this site, could the analytical laboratory report that, for example, there were no TCLP volatiles pres-

---

[10] In passing, plaintiff also states (without ever specifically arguing) that the trial court's denial of its motion for a directed verdict was also improper. We disagree. Given that the cost-effectiveness of plaintiff's cleanup was properly before the jury, looking at all the relevant evidence in a light most favorable to defendants, *Kubczak v Chemical Bank & Trust Co*, 456 Mich 653, 663; 575 NW2d 745 (1998), we believe reasonable jurors could have disagreed with regard to the cost-effectiveness of plaintiff's chosen remedial action. See *Hunt v Freeman*, 217 Mich App 92, 99; 550 NW2d 817 (1996).

[11] Toxicity Characteristic Leaching Procedure (TCLP).

ent, does that mean that there are none of those compounds present in the sample in question?

*Witness*: No, that's not what that means.

At this point, defense counsel objected and the jury was dismissed. During the course of the ensuing discussion among the parties and the court, plaintiff's counsel indicated that he was hoping to elicit from the witness testimony regarding what might have been found in the soil if a different test had been run. Counsel indicated he was concerned that defendant would be arguing that "because these TCLP tests show nothing, there is nothing there."[12] The court ruled that Kurkowski could testify with respect to what a TCLP test shows and does not show, but he could not speculate with respect to what might be present in the soil.

After the jury returned, the following exchange took place:

*Plaintiff's Counsel:* Mr. Kurkowski, can you very quickly describe for the jury the two basic types of tests?

*Witness:* The TCLP volatile extraction test is a test that indicates the amount of volatiles that would leach out of the sample.

*Plaintiff's Counsel:* Okay, and the second of the two tests?

*Witness*: The totals volatile test shows you how much total amount of volatiles are present in the sample.

*Plaintiff's Counsel*: And, . . . we're going back to the TCLP issue. You told us what you are able to discern from this is how much is leaching out, okay?

*Witness:* Yes.

---

[12] Plaintiff has not identified any point in the record where such an argument was made by defendants.

> *Plaintiff's Counsel:* What can't you discern from that TCLP leach test?
>
> *Witness:* The total amount of volatiles that would be in the sample.

This matter was revisited during plaintiff's direct examination of Edward Everett. Once again, the court ruled that the witness could not speculate with regard to what contaminates might be present in the soil. After that ruling, the following exchange took place:

> *Plaintiff's Counsel:* Does a TCLP extraction test measure the total quantity of contaminants present in a sample?
>
> *Witness:* No.
>
> *Plaintiff's Counsel:* Does a TCLP extraction test only indicate the quantity of contaminants that will leach out of a sample?
>
> *Witness:* That's precisely what it measures.

As these preceding excerpts show, plaintiff's concern that the jury would be misled by the TCLP test results was adequately addressed by the testimony allowed into evidence. The fact that a TCLP test does not measure the total amount of contaminates in a sample was amply made by both witnesses. Because any further speculation regarding what contamination might be present in the soil would only have served to confuse and mislead the jury, MRE 403, we conclude that the trial court did not abuse its discretion in preventing such speculative testimony from reaching the jury. *People v Gibson*, 219 Mich App 530, 532; 557 NW2d 141 (1996).

### IV. APPLICABILITY OF THE COLLATERAL SOURCE RULE

Next, plaintiff argues that the trial court erred in ruling that the collateral source rule did not apply to

the case and that any recovery awarded to plaintiff should be reduced by the $990,000 MUSTFA payment. Plaintiff asserts that this ruling effectively gave the benefit of this money from an independent source to the party responsible for the contamination. Again, we disagree.

As the Michigan Supreme Court observed in *Corl v Huron Castings, Inc*, 450 Mich 620; 544 NW2d 278 (1996), "[t]he collateral source rule is a concept of tort law which provides 'that the recovery of damages from a *tortfeasor* is not reduced by the plaintiff's receipt of money in compensation for his injuries from other sources.'" *Id.* at 626, quoting *Tebo v Havlik*, 418 Mich 350, 366; 343 NW2d 181 (1984) (emphasis added by the *Corl* Court). Because plaintiff's cause of action was based on the MERA, the collateral source rule is, by definition, inapplicable.

Further, an application of the collateral source rule in the case at hand is at odds with the cost-limiting goal of the MERA and its accompanying administrative rules. See discussion of issue I. Application of the collateral source rule would also collide with the Legislature's expressed goal of apportioning liability,[13] as well as the Legislature's invitation for the courts to be

---

[13] MCL 299.612c(1); MSA 13.32(12c)(1) read in pertinent part:

If 2 or more persons acting independently cause a release or threat of release that results in response activity costs, or damages for injury to, destruction of, or loss of natural resources, and there is a reasonable basis for division of harm according to contribution of each person, each person is subject to liability under section 12 *only for the portion of the total harm that the person caused.* [Emphasis added.]

governed by the principles of equity when apportioning liability.[14]

Finally, we reject the contention that by not applying the collateral source rule, the trial court allowed defendants to relieve themselves of responsibility. The verdict form used indicates that if the jury had found that monies in excess of $990,000 were necessary, the jury could have both awarded such monies and apportioned responsibility among all named parties.

### V. EXCLUSION OF EVIDENCE OF PLAINTIFF'S LEGAL FEES INCURRED WHILE LITIGATING THE MUSTFA REIMBURSEMENT

Plaintiff also argues that if defendants were entitled to the benefit of the MUSTFA reimbursement, then plaintiff was entitled to recover legal fees incurred as a result of the creation of this "common fund." We disagree.

Plaintiff's attempt to characterize the MUSTFA reimbursement as a "common fund" is misguided. The common fund rule is predicated on the principle that "[t]hose who share the fund would be unjustly enriched if they could take the benefit without the burden." Dobbs, Law of Remedies, § 3.10(2), p 280

---

[14] MCL 299.612c(3); MSA 13.32(12c)(3) read in pertinent part:

The court shall consider all of the following factors in allocating response activity costs and damages among liable persons:

\*　　\*　　\*

(b) The principles of equity pertaining to contribution.

\*　　\*　　\*

(e) Whether equity requires that the liability of some of the persons should constitute a single share.

(Hornbook Series: 2d ed, 1993).  "Recovery of fees under the common fund rule is special because it is a recovery *against allies, not adversaries. It is not fee shifting but fee sharing." Id.* (emphasis added). In light of these principles, and given the legal positions of the parties in the case at hand, we believe it is a mischaracterization to label the MUSTFA reimbursement a "common fund."

Moreover, given that "the Legislature did not intend to allow private parties to recover their attorney fees in actions under § 12" of the MERA, *Port Huron, supra* at 638, we conclude that the trial court did not err in excluding the challenged evidence.

### VI. PLAINTIFF'S MOTION FOR A MISTRIAL

Next, plaintiff contends that the trial court erred in denying plaintiff's motion for a mistrial. Plaintiff asserts that defendants deliberately interjected the matter of criminal fraud into the case when Steven Kitler, a DNR environmental quality analyst testifying on behalf of defendants, stated that he had sent a copy of a letter critical of plaintiff's remediation efforts to an investigator for the Michigan State Police who was at the time responsible for MUSTFA fraud cases. While we agree that the jury should not have been given this information, we disagree with plaintiff's assertion that only a mistrial could have properly remedied the situation.

After the challenged testimony by Kitler, the parties retired to the trial judge's chambers, where plaintiff made its mistrial motion. The judge denied that motion. Immediately after returning to the courtroom, the judge then instructed the jury as follows:

Ladies and gentlemen, I think, through inadvertence, some . . . testimony has been placed on the record which I'm going to caution *you to pay no attention to because it has nothing to do with this case.* The . . . last two questions elicited answers that this letter . . . was carbon copied to a particular individual who happened to be working for the Michigan State Police in a criminal investigation or criminal fraud division.

*There is no evidence that there was criminal fraud. There have never been any charges brought of fraud or criminal fraud with respect to this particular claim . . . , and you are to disregard that and not have that answer enter into your deliberations or decision making process.* [Emphasis added.]

We do not believe that the singular comment made by the witness about sending a copy of the letter to an individual working for the Michigan State Police was so egregious or prejudicial that a mistrial was necessary. Given that juries are assumed to adhere to the instructions they are given, *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), we conclude that any potential prejudice was cured by the timely and strongly worded cautionary instruction given by the trial court. Accordingly, the trial court did not abuse its discretion in denying plaintiff's motion for a mistrial. *Knight v Gulf & Western Properties, Inc*, 196 Mich App 119, 132; 492 NW2d 761 (1992).

### VII. TESTIMONY ADDRESSING POTENTIAL ADDITIONAL SOIL DISPOSAL COSTS

Plaintiff also argues that because the issue of cost was contentious, the trial court erred in not allowing plaintiff to present evidence that plaintiff's cost for removing the contaminated soil could have been

much greater had it been treated as hazardous instead of nonhazardous.

We disagree with plaintiff's contention. "[A] trial court may exclude evidence as speculative." *Harrison v Grand Trunk W R Co*, 162 Mich App 464, 469; 413 NW2d 429 (1987). See also MRE 401, 403. Any opinion testimony regarding the possible effect that recharacterization of the soil might have had on the overall cleanup costs was based on uncertain and speculative assumptions about the nature of soil. Such testimony was, therefore, properly excluded. *Gibson, supra* at 532; *Harrison, supra* at 469.

### VIII. PLAINTIFF'S MOTION FOR JNOV OR A NEW TRIAL

We also disagree with plaintiff's assertion that the trial court erred in denying plaintiff's motion for judgment notwithstanding the verdict (JNOV) or a new trial. Part of plaintiff's argument with regard to this issue is predicated on the presumption that the trial court erred in the ways alleged in issues II through VI. Because we have concluded that the trial court did not err in any of the ways alleged, we necessarily conclude that the trial court did not err in rejecting this portion of plaintiff's argument. Further, plaintiff's assertions that the verdict was against the great weight of the evidence, was grossly inadequate, and was influenced by passion and prejudice are entirely unsupported by the evidence, as well as being based on fallacious circular reasoning. We see no abuse of discretion on the part of the trial court. *Bosak v Hutchinson*, 422 Mich 712, 737; 375 NW2d 333 (1985); *Michigan Microtech, Inc v Federated Publications,*

*Inc*, 187 Mich App 178, 186-187; 466 NW2d 717 (1991).

IX. PLAINTIFF'S SUPPLEMENTAL JURY INSTRUCTIONS

Next, plaintiff argues that the trial court erred in failing to give four requested supplemental jury instructions. We review claims of instructional error for an abuse of discretion. *Joerger v Gordon Food Service, Inc*, 224 Mich App 167, 173; 568 NW2d 365 (1997).

After reviewing all four proposed instructions, we fail to see an abuse of discretion. The Michigan Supreme Court observed in *Jones v Porretta*, 428 Mich 132; 405 NW2d 863 (1987), that "MCR 2.516(D)(4) requires more than a showing that the additional instructions correctly state the law; it requires that the instructions be 'concise, understandable, conversational, unslanted, and nonargumentative,' as well as based on 'applicable law.' " *Id.* at 143, quoting MCR 2.516(D)(4). While all four proposed instructions accurately state the law, they violate the rule that they must also be unslanted and nonargumentative. The first three proposed instructions tend to suggest that all costs incurred by plaintiff were, as a matter of law, necessary and in accordance with the relevant administrative rules. This implication is at odds with what other administrative rules have to say about the issue of cost. See issue I. As for the fourth proposed instruction, it is written in the form of a syllogism. Accordingly, it invades the province of the jury by manipulating the jury into accepting as true a series of conclusions based on a corresponding series of minor premises. Such an instruction does not adequately protect the rights of all parties to the case. See *Joerger, supra* at 173.

## X. MEDIATION SANCTIONS

Finally, plaintiff argues that the trial court erred in awarding mediation sanctions to defendants under MCR 2.403. We disagree. We review a trial "court's decision whether to grant mediation sanctions de novo." *Great Lakes Gas Transmission Ltd Partnership v Markel*, 226 Mich App 127, 129; 573 NW2d 61 (1997).

Neither party disputes that given the outcome of the trial, defendants were entitled to mediation sanctions. MCR 2.403(O)(1). Accordingly, defendants are entitled to recover those actual costs incurred after the mediation evaluation was rejected. For purposes of the court rule, actual costs are defined as "those costs taxable in any civil action, and . . . a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the mediation evaluation." MCR 2.403(O)(6)(a), (b). Plaintiff is challenging only that portion of the sanctions that reflects an award of attorney fees.

"The factors to be considered when determining what constitutes reasonable attorney fees are listed in Michigan Rule of Professional Conduct 1.5(a)."[15] *Jor-*

---

[15] MRPC 1.5(a) reads in pertinent part:

The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the expe-

*dan v Transnat'l Motors, Inc,* 212 Mich App 94, 97; 537 NW2d 471 (1995). The record reveals that the trial court completely and carefully examined all the relevant factors. After reviewing its decision, we are convinced that the trial court's conclusion was reasonable and therefore not erroneous.

As for plaintiff's contention that the trial court disregarded its own ruling when it considered and awarded fees for legal expenses incurred with regard to matters other than damages, we note that the ruling referenced was a series of statements made by the trial judge in open court. The trial court was not bound by such statements. See *Pierson v Pierson,* 351 Mich 637, 646; 88 NW2d 500 (1958) (observing that a court is bound by its written judgments, not by any colloquy it may have had with counsel).

Given our resolution of those issues raised by plaintiff on appeal, we need not address those matters raised by defendants in their cross appeal.

Affirmed.

---

rience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.