633 N.W.2d 449 (2001)
RCO ENGINEERING, INC., Plaintiff/Counter-Defendant-Appellant/Cross-Appellee,
v.
ACR INDUSTRIES, INC., Roger W. Blanchard, Robert Kazmarek and Mary Kazmarek, jointly and severally, Defendants/Counter-Plaintiffs/Third-Party Plaintiffs-Appellees/Cross-Appellants.
Docket No. 201436.
Court of Appeals of Michigan.
Submitted October 31, 2000, at Detroit.
Decided June 22, 2001, at 9:00 a.m.
Released for Publication September 18, 2001.
*451 Fraser Trebilcock Davis & Foster, P.C. (by Michael H. Perry and Thomas J. Waters), Lansing, for the plaintiff.
Kotz, Sangster, Wysocki and Berg, P.C. (by Jeffrey M. Sangster and Robert T. Smith), and Kelley, Casey & Clarke, P.C. (by Stephen M. Kelley and Bradford S. Moyer), Detroit, for the defendants.
Before MARK J. CAVANAGH, P.J., and HOLBROOK and WHITBECK, JJ.

*450 ON REMAND
PER CURIAM.
This case returns to us on remand from our Supreme Court. In lieu of granting plaintiff leave to appeal, the Supreme Court vacated part II of our prior opinion[1] and directed us to consider "whether the trial court erred in denying plaintiff's motion in limine on the ground that defendant was permitted to present evidence regarding the cost-effectiveness of a `Type B' cleanup despite the [Michigan Department of Natural Resources'] `approval' of the `Type A' cleanup." 463 Mich. 893, 618 N.W.2d 769 (2000). We conclude that had the DNR approved the Type A cleanup of the site, the trial court's denial of defendants' motion in limine would not have been in error. Further, because the issue whether the DNR had approved the Type A cleanup was contested below, we conclude that the trial court did not err in permitting evidence of the disputed cost-effectiveness of the cleanup to be considered by the jury.

I
The underlying facts of this case were set forth in our prior opinion:
In 1968, defendant Roger W. Blanchard and others purchased some vacant *452 property located in Roseville, Michigan. Facilities constructed on the property by a predecessor company to defendant ACR Industries, Inc., (hereinafter ACR) were used by ACR and its predecessor from 1968 until 1988. Both ACR and its predecessor manufactured aerospace equipment at these facilities. In 1968, ACR's predecessor placed a three thousand-gallon underground storage tank on the property. Petroleum products used by ACR during the manufacturing process were routinely dumped into the tank. ACR continued to use the tank until ACR moved from the property in 1988.
In 1987, Paul Carollo, a founder of plaintiff corporation, purchased the property from defendants Robert and Mary Kazmarek, and Blanchard. The property was then leased to plaintiff. In 1991, plaintiff began the process of removing the storage tank. In July of that year, plaintiff confirmed that there had been a release of hazardous substances from the tank. At the time, administrative rules promulgated by the [DNR] under the then-current version of the Michigan Environmental Response Act (MERA), M.C.L. § 299.601 et seq.; MSA 13.32(1) et seq., identified three distinct types of cleanup that could be done on a site contaminated by the discharge of hazardous substances. These cleanup types were labeled "Type A," "Type B," and "Type C."... Plaintiff chose to remediate the site using a Type A cleanup.
In January 1993, plaintiff brought suit against defendants under the MERA. Plaintiff alleged that ACR was liable for approximately $1.5 million in response activity costs incurred in cleaning up contamination of the property caused by the leaking of hazardous substances from the storage tank....At trial, the parties hotly contested whether a Type A or Type B cleanup should have been used to remediate the site and whether the issue of cost should enter into any examination of the appropriate type of cleanup.
A jury found that although defendants were liable, plaintiff failed to establish that any response activity costs in excess of $990,000 were necessary. Given that plaintiff had already been reimbursed $990,000 by the state pursuant to the then-current version of the Michigan Underground Storage Tank Financial Assurance Act (MUSTFA), M.C.L. § 299.801 et seq.; MSA 13.29(201) et seq., plaintiff took nothing on its claim.[2]
The MERA was repealed by the Legislature effective March 30, 1995. 1994 PA 451. The MERA's provisions were recodified as Part 201 (Environmental Response), M.C.L. § 324.20101 et seq., of the Natural Resources and Environmental Protection Act (NREPA), M.C.L. § 324.101 et seq. Pursuant to M.C.L. § 324.102, repeal of the MERA "does not relinquish any penalty, forfeiture, or liability, whether criminal or civil in nature, and such statute shall be treated as still remaining in force as necessary for the purpose of instituting or sustaining any proper action or prosecution for the enforcement of the penalty, forfeiture, or liability." Further, while Part 201 of the NREPA was amended twice in 1995, 1995 PA 71 and 1995 PA 117, those amendments do not apply to the case at hand, given that it was initiated before May 1, 1995. MCL 324.20102a(1)(a). Accordingly, all statutory references in this opinion will be to the prior provisions and compiled law numbers in effect during the *453 relevant portions of the proceedings below.
Plaintiff's motion in limine[3] asked the trial court to strike defendants' first and second defenses and to foreclose defendants from presenting any evidence on their claim that the Type A cleanup was excessive. Defendants' first affirmative defense stated that "[p]laintiff's claims are barred for the reason that its costs associated with its alleged corrective response and/or remediation activities incurred are excessive, unnecessary and were not reasonable when paid." Defendants' second affirmative defense stated that
[p]laintiff's claims for reimbursement for costs associated with its alleged corrective, response and/or remediation activity incurred were not necessary response costs as any cleanup activity was not consistent with or required by or, alternatively, went beyond what was required by the state or federal statutes, regulations and guidelines regulating the section and/or implementation of response and/or remediation activity.[4]
The trial court denied plaintiff's motion. Citing the legislative history of the 1990 amendment of the MERA,[5] the trial court drew the following conclusions:
Considering the purpose of the statute and rule, it would be consistent to require a private party to consider the relative criteria applicable to the DNR when selecting remedial alternatives. To allow a private party to select a type of remedy which does not offer any greater protection for the environment but is much more costly than other alternatives is not consistent with the intent of the legislature to control the cost of cleanup to encourage development.
The criteria found in rule 603(1)[6] should apply when a private party selects *454 the type of cleanup. The rules require consideration of the cost of cleanup when choosing among alternatives which adequately protect the environment. 1990 AACS 299.5601(3).[7] Since the DNR has determined that type A and Type B remedies equally protect the environment, the rule should be construed to require consideration of cost.
Directly addressing the issue of possible approval of plaintiff's plan by the DNR, the trial court concluded:
The DNR's approval of the type A plan does not preclude subsequent challenges of the selection. Plaintiff has failed to cite any authority to support a claim that potentially responsible parties (PRPs) can not challenge the agency's decisions. Defendants were not parties to the decision making process at the agency level. There is evidence the DNR questioned whether this cleanup was excessive.
We do not read the first line of the immediately preceding passage as rendering a judicial finding that the DNR had approved the Type A cleanup of the site. Instead, we read the court as having responded towithout endorsingthe possibility that the DNR had approved the remedial action. In other words, we read the court as saying that even if the DNR had approved the Type A cleanup, defendants would not be precluded from making the disputed arguments.
Plaintiff argued in support of its motion in limine that the DNR had "expressly approved" the Type A cleanup. Defendants disputed this assertion, arguing in their brief in opposition to the motion that they believed "that the trial testimony will show that the only reason Plaintiffs [sic] sought a `Type A' clean-up was because Plaintiff assumed, erroneously, that the Michigan Department of Natural Resources... would insist on a `Type A.'" In support of its assertion, plaintiff cited a November 15, 1994, letter sent to it by the DNR, in which the DNR concurred in the conclusion "that the response activities undertaken at this facility have reduced contamination to concentrations below acceptable type A cleanup levels." We do not read this conclusion as necessarily implying DNR approval of the Type A cleanup. Rather, it can reasonably be read as assuming the existence of the Type A action and simply stating that the contamination levels specified for such a level of cleanup have been met. Thus, it does not necessarily imply either a pre- or post-cleanup *455 approval of plaintiff's choice of remedial action.
Further, we note that the factual question whether the DNR had approved plaintiff's remedial action was contested during the presentation of proofs. See discussion in part III, infra. It would make no sense for the trial court to make a specific finding regarding the question and then proceed to allow the parties to present proofs with regard to the matter if the trial court had resolved this matter.

II
As this Court observed in Flanders Industries, Inc. v. Michigan, 203 Mich.App. 15, 22, 512 N.W.2d 328 (1993), the MERA, as amended,[8] "must be interpreted to minimize delay in removing environmental contamination." This point was echoed in Port Huron v. Amoco Oil Co., Inc., 229 Mich.App. 616, 583 N.W.2d 215 (1998):
[T]he legislative history indicates that the MERA was amended, in part, "to expedite cleanup of sites of contamination by providing the DNR with enforcement tools necessary to compel compliance with the act and by providing for penalties and positive incentives to encourage polluters to pay for, and promptly implement, cleanup."[Id. at 632, 583 N.W.2d 215.]
See also 1990 AACS, R. 299.5501(1) ("The principal objective of all response activities is to ensure prompt and adequate response to known sites of environmental contamination.").
The goal of facilitating and expediting cleanup of contaminated sites is furthered by the MERA's limitation of preenforcement judicial review. See Pitsch v. ESE Michigan, Inc., 233 Mich.App. 578, 590, 593 N.W.2d 565 (1999). MCL 299.616(4) provided:
A state court shall not have jurisdiction to review challenges to a response activity selected or approved by the department under this act, or to review an administrative order issued under this act in any action except an action that is 1 of the following:
(a) An action to recover response costs, damages, or for contribution.
(b) An action by the state to enforce an administrative order under this act or by any other person under section 15(1)(b) to enforce an administrative order or to recover a fine for violation of an order.
(c) An action pursuant to section 10f(5) for review of a decision by the department denying or limiting reimbursement.
(d) An action pursuant to section 15 challenging a response activity selected or approved by the department, if such action is filed after the completion of the response activity.
(e) An action by the state pursuant to section 12(6) to compel response activity.
While this statute limits the available avenues for challenging response activity, it plainly states that a challenge can be made to response activity that has been approved by the DNR as long as it is raised in the context of the identified actions. Defendants' challenge to the response activity employed, which came after and in response to plaintiff's complaint seeking contribution for costs incurred, falls within these parameters.[9] MCL *456 299.616(4)(a). Further, we believe that implicit in the statute is the understanding that remedial action would not be delayed if a challenge is raised in a contribution action, where the question of liability is the central issue. Delaying remedial action until the liability question was settled would effectively undermine the goal of facilitating and expediting cleanup.
Given the conclusion that challenges can be raised in court to a remedial action "approved" by the DNR, the question then becomes whether the challenges a party may bring against an approved remedial action include a challenge to its cost-effectiveness. We believe that the issue of cost-effectiveness is properly raised in an action such as the case at hand.
"[T]o recover its cleanup costs from a party responsible for the pollution, a private party must show that its `response activity' costs were (1) `necessary' and were incurred (2) `consistent with [the MDNR rules].'"Port Huron, supra at 625, 583 N.W.2d 215. The Port Huron Court "construe [d] the phrase `necessary costs of response activity' to mean those response activity costs that are `required' in remediating a contaminated site to protect the public health, safety, or welfare, or the environment, or the natural resources." Port Huron, supra at 629, 583 N.W.2d 215. Necessary or required costs include remedial action. Id.
However, while remedial action is required, the rules do not require that every contaminated site be cleaned to the high degree that a Type A cleanup requires. When this remediation was undertaken, the rules identified three types of cleanup: Type A, Type B, and Type C. 1990 AACS, R. 299.5703.[10] The rules clearly stated that all three degrees of cleanup were considered viable options. See, e.g., 1990 AACS, R. 299.5705(2).[11] In fact, the rules even stated that a "combination of types may be used at a single site to develop an acceptable remedial action." 1990 AACS, R. 299.5705(3). Rosemary Ayers, the DNR staff member first assigned to evaluate plaintiff's plans to remediate the site, specifically testified that despite her personal predilections, a Type A cleanup "wasn't necessary" for plaintiff's site. If she had been asked by plaintiff, Ayers stated she would have permitted a Type B cleanup of the site. This conclusion was supported by the testimony of Steven Kitler, the DNR employee who assumed Ayers duties vis-a-vis plaintiff in early 1992. Kitler testified that, given the *457 conditions that existed, a Type B cleanup would have been available for the site.
The issue of consistency with the rules is also a proper area of inquiry in a cost recovery action.[12] The rules clearly indicate that the cost of a remedial action must be considered. In 1990 AACS, R. 299.5601(3), using language that does not specify an actor and thus is applicable to any party selecting a remedial action, the rules state that the "cost of a remedial action shall be a factor only in choosing among alternatives which adequately protect the public health, safety, welfare and the environment and natural resources, consistent with part 7 of these rules." This passage carefully balances the goal of adequately remediating a contaminated site with the goal of minimizing the cost of remediation. The rule indicates that whatever remedial action is chosen, it must "protect the public health, safety, welfare and the natural environment and natural resources."
This directive, however, is tempered by the adverb "adequately" and the citation of "part 7 of these rules." Part 7 of the rules, entitled "Cleanup Criteria," sets forth both the three degrees of clean-up acceptable and the concentration criteria that satisfy the different degrees of cleanup in the various environmental media identified. This scheme recognizes that under appropriate conditions, each degree of cleanup is protective of the public health, safety, welfare, and the natural environment and natural resources. If there were only one level of cleanup, one level of concentration criteria that protected the public health, safety, welfare, and the natural environment and natural resources, then the modifier "adequately" would be superfluous. However, the rules do not establish such a singular universe of protection. Instead, the universe of protection includes various degrees of cleanup, each of which is subdivided according to various spans of acceptable concentrations in differing environmental media. Thus, as used here, the term "adequate" means reaching sufficient levels of concentration within a sufficient degree of cleanup under the circumstances.
Balanced against this aim to remediate adequately is the goal of keeping an eye on the cost of remediation. The first half of the rule plainly mandates that the "cost of a remedial action shall be a *458 factor." (Emphasis added.) The term "only" does not diminish the concern over minimizing cost. Rather, it indicates that the concern over cost should not overwhelm the goal of adequately remediating the contaminated site. In other words, if two alternative actions are proposed, one of which does adequately protect the public health, safety, welfare, and the natural environment and natural resources and one of which does not, the party choosing the action to implement cannot argue that the latter should be chosen because it costs less. However, if both alternatives adequately protect the public health, safety, welfare, and the natural environment and natural resources, then the party choosing must consider the cost of the alternatives when selecting a remedial action. For example, if in given circumstances, both a Type A and a Type B cleanup would be adequate from a remediation perspective, then the party choosing the degree of cleanup must consider the cost of remedial action when making the selection.
Contrary to the position taken by plaintiff throughout the course of the litigation, the instruction that the "remedial action type proposed shall be at the option of the person proposing the remedial action," 1990 AACS, R. 299.5705(4) does not give the proposing party a free hand in choosing a remedial action. The recognition that the party proposing the type of remedial action has the option or the authority to choose the type to be proposed does not release that party from the directive to consider cost.
The rules also specify a number of factors the DNR must consider when "assessing remedial action alternatives." 1990 AACS, R. 299.5603(1). We believe the use of the term "assessing" means that this directive applies when the DNR is selecting or approving a remedial action. If the drafters of the rules had meant that the listed factors should be considered only when the DNR was in one, but not the other, of these two postures, then it could have simply stated so by using "selecting" or "approving" in place of "assessing." We interpret the decision not to use these words as purposeful. The act of assessing or evaluating remedial action alternatives is undertaken by the DNR in both situations and should accordingly include evaluation of the factors listed. Among these factors are the "[c]osts of remedial action, including long-term maintenance costs...." 1990 AACS, R. 299.5603(1)(f). The caveat in Rule 299.5603(1)(f) "that costs shall only be considered as specified in R. 299.5601(3)" is simply a reaffirmation of the principle expressed in Rule 299.5601(3) that the alternatives involved must "adequately protect the public health, safety, welfare and the environment and natural resources...."
1990 AACS, R. 299.5705(4) does remove the DNR's discretion regarding approval, but only under the limited circumstance where the proposed "remedial action plan... provides for a remedy which meets the applicable criteria set forth in this part and parts 5 and 6 of these rules. Approval shall be granted for type A, type B, or type C plans, or for plans which involve a combination of types, if all applicable requirements are satisfied." (Emphasis added.) Included among these "criteria" and "requirements" is consideration of the cost of the proposed remedial action.
Accordingly, if the DNR had approved plaintiff's selection of the Type A cleanup, then the trial court would not have been in error to allow evidence regarding the issue of the cost-effectiveness of that choice.

III
In this case, however, the issue whether the DNR had actually approved the Type A cleanup before it was undertaken *459 by plaintiff was contested at trial. In its application for leave to appeal in the Supreme Court, plaintiff states flatly that "the [DNR] directed RCO to perform a Type A closure." A review of the record shows that the matter is not as indisputable as plaintiff's assertion indicates.
Rosemary Ayers was the DNR staff member first assigned to evaluate plaintiff's plans to remediate the site. When asked by plaintiff's counsel who made the decisions in 1991 concerning whether to pursue a Type A or Type B cleanup, Ayers responded, "Generally II emphasize generally, I would look for Type A. The only times when you look for a Type B is when you could not, through some reason get to a Type A clean up." Ayers also indicated that in making these decisions, she was carrying out department policy. Ayers noted that in 1991 her office was overseeing Type B cleanups, as well. Unable to recall specifically the circumstances involved in these Type B cleanups, Ayers stated that generally they occurred in an industrial area where, for example, the site's "neighbors are also suffering from an underground storage tank contamination, a leak, and where it really cannot be determined the extent of contamination at that point, nor where it begins or ends."
As for the site involved in the case at hand, Ayers stated she had only a "vague recollection" of it. Ayers testified that she could not "recall any specific conversation regarding" discussions with plaintiff concerning whether to pursue a Type A or Type B cleanup. When asked by plaintiff's counsel what, if any, general recollection she had on the matter, Ayers answered, "As to that topic and generally I would have sites go to Type A, go to clean." When asked to explain why she did this, Ayers responded, "Because of the time involved for the review for Type B closures. As I mentioned before, ... you have to document why you believe it should go to Type B. It then has to be reviewed by superiors and geologists...." However, when asked by defense counsel if she would have refused to allow plaintiff to pursue a Type B cleanup if plaintiff had approached her saying that it could save $500,000 in so doing, Ayers stated that she would not have refused the request, even though she personally preferred Type A cleanups.
Elmer Drew, a corporate engineer working for plaintiff at the time of the cleanup, testified that he was the "contact person" between plaintiff and the DNR. According to Drew, while there were some discussions with the DNR about different types of cleanups, the DNR was pushing the Type A cleanup. Specifically, Drew testified that
there was some discussion, A and B, but that's all it was. Does A, B, and C exist? You could get people to say it was, but if you talked to the DNR, the only thing they'd talk to you about is Type Aand I think that DNR rep said that when she was hereand that's exactly what we got.
Later on, when plaintiff was nearing the end of the cleanup, Drew stated the DNR's advocacy of a Type A cleanup began to change:
When we were near the end of the cleanup, we were chasing high metals in two areas.... And at that time I talked to Ms. ayers [sic] because it looked like it was going to violate the foundation of the ACR building ... in which case I would be very concerned to start excavating up in that area. And at that one point she told me to go as far as I could and if it didn't clean up, to talk with her because they were beginning to change their views on such things. It did clean up, so I never had a subsequent conversation.
*460 However, when directly asked by plaintiff's counsel if Ayers ever told him that plaintiff "had to do a Type A," Drew did not say that she had done so. Instead, Drew answered the question this way: "That was all that was discussed. That was the only discussion, as far as she was concerned."
Kitler testified he first became aware of the site when he was asked to review the project by Consolidated Risk Management, the MUSTFA administrator at the time. Kitler testified that his review of plaintiff's file showed that none of the work done on the site had been approved by the DNR:

Defense Counsel: Was there any indication in the file that either Rosemary Ayers or anyone on behalf of the DNR approved the initial excavation activities?

Witness: No.

Defense Counsel: Was there any indication in the file that the DNR, Rosemary Ayers, or anyone on behalf of the DNR approved the corrective action work plan or any of the subsequent excavation that was done at the site?

Witness: No.
Kitler documented his concerns with the site remediation in a letter dated January 29, 1993,[13] which was addressed to Drew:
The following is a list of departmental comments concerning corrective actions that have occurred at this facility:
1. The extensive excavation activities at this facility did not have prior approval from the MDNR.

* * *
3. Excavation was conducted at this facility without full knowledge of the nature and extent of contamination. This resulted in repeated contaminant migration back into the excavation. Much of this recontaminated material... required hazardous waste disposal.
4. Areas with no prior indication of contamination and areas with contaminant concentrations well below Type B levels were excavated.

* * *
6. Contaminant free areas in the excavation were repeatedly excavated and re-sampled when a portion of the excavation was enlarged or rainwater was removed. This has resulted in some apparently clean areas being excavated and sampled two or three times.
The January 29 letter also criticized the lack of a feasibility study and what Kitler characterized as excessive verification sampling.
Kitler testified that the lack of knowledge identified in item no. 3 could have led to increased costs. As for item no. 4, Kitler testified that he was expressing his concern that there were areas in the site "that ... didn't appear to be contaminated above Type B levels, that were excavated; or, in fact, there were areas that I didn't believe were contaminated, with available information, that were excavated."
Kitler also wrote in the January 29 letter about areas of concern with the investigation work plan noted by Ayers in a letter dated November 18, 1991.[14] "The site investigation work plan prepared for this facility was denied by our department November 18, 1991. Deficiencies listed in the letter were never addressed and activities were initiated without the approval of *461 our department," Kitler wrote. Kitler did, however, acknowledge that the word "denied" does not appear in the November 18 letter.
Kitler further testified that in his opinion, plaintiff did not need to pursue a Type A cleanup of the site. Kitler stated that Type B cleanups were being allowed by his office at that time, and it was his belief that plaintiff would have been allowed to pursue a Type B cleanup.
This evidence shows that the issue whether the Type A cleanup had been officially approved by the DNR was hotly contested by the parties at trial. Under these circumstances, we do not believe that the trial court erred in allowing evidence regarding the cost-effectiveness of the cleanup.[15]
Affirmed.
NOTES
[1] RCO Engineering, Inc. v. ACR Industries, Inc., 235 Mich.App. 48, 597 N.W.2d 534 (1999).
[2] RCO, supra at 51-53, 597 N.W.2d 534.
[3] Plaintiff's motion in limine was first presented as motion for partial summary disposition. After that motion was stricken because it was untimely, plaintiff refiled the pleading as a motion in limine.
[4] Defendants' affirmative defenses were filed on March 15, 1993. The wording of the first two defenses in that document differs somewhat from the language presented in the text above, which is taken from footnote 3 of defendants' brief in opposition to plaintiff's motion for partial summary disposition. The original wording is as follows:

Plaintiff's claims are barred for the reason that its costs associated with its response and/or remediation activities incurred are excessive and were not reasonable when paid.
Plaintiff's claims for reimbursement for costs associated with its response and/or remediation activity incurred were not necessary response costs as any clean-up activity was not consistent with or required by or, alternatively, went beyond what was required by the state and/or federal statutes, regulations and guidelines regulating the selection and/or implementation or response and/or remediation activity.
The trial court's opinion and order on the motion in limine quotes the wording set forth in defendant's brief in opposition to plaintiff's motion for partial summary disposition.
[5] The trial court's opinion and order paraphrased the following passage from the House Legislative Analysis:"One of the problems that both businesses and the state face is the exorbitant costs for cleanup." House Legislative Analysis, HB 5758 & SB 1020, September 17, 1990, p. 1.
[6] Rule 299.5603(1) read:

(1) In assessing remedial action alternatives, the department shall consider all of the following:
(a) The effectiveness of alternatives in protecting the public health, safety, and welfare and the environment and natural resources.
(b) The long-term uncertainties associated with the proposed remedial action.
(c) The goals, objectives, and requirements of Act No. 641 of the Public Acts of 1978, as amended, being § 299.401 et seq. of the Michigan Compiled Laws, and known as the solid waste management act, and Act No. 64 of the Public Acts of 1979, as amended, being § 299.501 et seq. of the Michigan Compiled Laws, and known as the hazardous waste management act.
(d) The persistence, toxicity, mobility, and propensity to bioaccumulate of the hazardous substance.
(e) The short and long-term potential for adverse health effects from human exposure.
(f) Costs of remedial action, including long-term maintenance costs, except that costs shall only be considered as specified in R. 299.5601(3).
(g) Reliability of alternatives.
(h) The potential for future remedial action costs if the alternative fails.
(i) The potential threat to human health, safety, and welfare and the environment and natural resources associated with excavation, transportation, and redisposal or containment.
(j) The ability to monitor remedial performance.
(k) The public's perspective about the extent to which the proposed plan effectively addresses criteria specified in these rules.
[7] Rule 299.5601(3) read: "The cost of a remedial action shall be a factor only in choosing among alternatives which adequately protect the public health, safety, welfare and the environment and natural resources, consistent with the requirements of part 7 of these rules."
[8] At the time of Flanders, the MERA had been amended by 1987 PA 166, 1989 PA 157, 1990 PA 233, and 1990 PA 234. Flanders, supra at 20, 512 N.W.2d 328.
[9] Defendants contend that they were not notified of plaintiff's actions until the cleanup was almost complete. However, assuming arguendo that this remedial action was approved by the DNR, even if defendants had been informed before any remediation began, they would not be able to bring an action challenging that remedial action until it had been completed. MCL 299.616(4)(d).
[10] Rule 299.5703 read in pertinent part:

(p) "Type A" means the degree of clean-up which reduces hazardous substance concentrations such that those concentrations do not exceed background or method detection limits for a hazardous substance, consistent with the provisions of R. 299.5707.
(q) "Type B" means the degree of clean-up which provides for hazardous substance concentrations that do not pose an unacceptable risk on the basis of standardized exposure assumptions and acceptable risk levels described in the provisions of R. 299.5709 to R. 299.5715.
(r) "Type C" means the degree of clean-up which provides for hazardous substance concentrations that do not pose an unacceptable risk, considering site-specific assessment of the risk as provided for in R. 299.5717.
[11] 1990 AACS, R. 299.5705(2) read:

(2) Removal, treatment, or contaminant measures shall be implemented to attain 1 or more of the following degrees of clean-up;
(a) Type A.
(b) Type B.
(c) Type C.
[12] The MERA differentiates between the DNR's "selecting" of a response activity and the DNR's "approval" of a response activity. See, e.g., M.C.L. § 299.616(4) ("A state court shall not have jurisdiction to review challenges to response activity selected or approved by the department under this act ... in any action except an action that is 1 of the following....") (Emphasis added.) The act of selection involves the choice of alternatives, and thus implies a degree of action and involvement beyond that of mere approval or confirmation of a choice made by another. In other words, the party proposing a single remedial action alternative is the party who has selected the action, while the party approving the action is only ratifying a selection previously made by another. While plaintiff argues that Ayers was practically insistent that plaintiff clean the site to the Type A level, plaintiff nonetheless consistently argues that the DNR approved the remedial action. This posture is reflected in the question our Supreme Court has directed us to answer.

In terms of judicial review, this distinction affects the scope of judicial review. For example, M.C.L. § 299.616(5) states: "In considering objections raised in a judicial action under this act, the court shall uphold the state's decision in selecting a response activity unless the objecting party can demonstrate based on the administrative record that the decision was arbitrary and capricious or otherwise not in accordance with law." (Emphasis added.) This standard of review applies when the action challenged is the state's selection of a remedial action, but would not apply to the state's approval of a remedial action proposed by another party.
[13] Although the January 29 letter was signed by someone other than Kitler, Kitler testified that he indeed had written the document.
[14] As with the January 29 letter, the November 18 letter was signed by someone other than Ayers, who had actually composed the document.
[15] Further, we believe that the jury's verdict can be reasonably read as having rejected plaintiff's argument that the Type A cleanup had been approved. Plaintiff's counsel vigorously argued in his closing statement that the evidence established that the Type A cleanup had been approved. Several times during his closing, counsel stated that Ayers had approved the Type A cleanup. Indeed, counsel even stated that Ayers had actually told plaintiff to do a Type A cleanup. Defense counsel argued in his closing that no such approval or command had been issued. Given the jury's conclusion that plaintiff had not incurred costs in excess of $990,000 that were both necessary and consistent with the rules, one reasonable conclusion that could be drawn is that the jury rejected plaintiff's contention that it had proved that the Type A cleanup was approved. Of course, it is also reasonable to conclude that the jury could have found that the Type A cleanup had been approved, but that plaintiff had not shown that all the costs associated with achieving this level of clean were necessary and consistent. Given the verdict form, however, this is a question we cannot, should not, and need not attempt to resolve.