*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

INFINITY-BROWNSTOWN LLC,

Plaintiff-Appellant,

v

DOVE'S POINTE HOMEOWNERS
ASSOCIATION,

Defendant-Appellee.

UNPUBLISHED
May 27, 2021

No. 351827
Wayne Circuit Court
LC No. 18-013337-CB

---

INFINITY-BROWNSTOWN LLC,

Plaintiff-Appellee,

v

DOVE'S POINTE HOMEOWNERS
ASSOCIATION,

Defendant-Appellant.

No. 351845
Wayne Circuit Court
LC No. 18-013337-CB

---

Before: RONAYNE KRAUSE, P.J., and RIORDAN and O'BRIEN, JJ.

PER CURIAM.

In Docket No. 351827, plaintiff Infinity-Brownstown LLC appeals as of right the part of the trial court's opinion and order dismissing its breach-of-contract and tortious-interference claims for lack of damages. In Docket No. 351845, defendant Dove's Pointe Homeowners Association appeals as of right the part of the trial court's opinion and order declaring that plaintiff possesses a contractual right to build and lease multiple condominium units in the condominium project and that defendant committed a breach of contract by attempting to prevent it from doing so. We agree with plaintiff that the trial court erred in concluding that its alleged damages were speculative and disagree with defendant that the trial court erred in its contractual analysis.

-1-

Accordingly, we affirm in part and reverse in part, and remand to the trial court for further proceedings.

## I. FACTS AND PROCEEDINGS

This case concerns a condominium project, its governing documents, and attempted amendments thereto. In August 2003, King/Inkster II, LLC, executed the Master Deed for Dove's Pointe Condominiums, establishing itself as the "Developer" for the purposes of the Master Deed and accompanying documents. The Master Deed provides that "[a]ny or all of the rights and powers granted or reserved to the Developer in the Condominium Documents or by law . . . may be assigned by it to any other entity or to the Association." The Bylaws, which were recorded with the Master Deed, provided that "[t]he Developer may lease any number of Units in the Condominium in its discretion without approval by the Association."

The relevant provisions of the Master Deed are as follows:

**MASTER DEED**

**Dove's Pointe Condominiums**

This Master Deed is made and Executed on August 27, 2003, by King/Inkster II, LLC, a Michigan limited liability company, hereinafter referred to as "Developer" . . . in pursuance of the provisions of the Michigan Condominium Act . . . hereinafter referred to as the "Act."

**WHEREAS**, the Developer desires by recording this Master Deed, together with the Bylaws attached hereto as Exhibit A . . . to establish the real property described in Article II below . . . as a residential Condominium Project under the provisions of the Act.

\* \* \*

**ARTICLE III**

**DEFINITIONS**

\* \* \*

Section 2. **Association**. "Association" means Dove's Pointe Condominium Association . . . .

\* \* \*

Section 12. **Developer**. "Developer" means King/Inkster II, LLC, a Michigan limited liability company, which has made and executed this Master Deed, and its successors and assigns. Both successors and assigns shall always be deemed to be included within the term "Developer" whenever, however, and wherever such terms are used in the Condominium Documents.

\* \* \*

## ARTICLE IX

### Amendment

This Master Deed and the Condominium Subdivision Plan (Exhibit B to said Master Deed) may be amended with the consent of 66-2/3% of the Co-owners except as hereinafter set forth:

\* \* \*

Section 6.  **Developer Approval**.  This Master Deed shall not be amended nor shall the provisions thereof be modified without the written consent of the Developer so long as the Developer continues to offer any Unit in the Condominium for sale or for so long as there remains, under such provisions, any further possibility of expansion of the Condominium Project. . . .

## ARTICLE X

### ASSIGNMENT

Any or all of the rights and powers granted or reserved to the Developer in the Condominium Documents or by law . . . may be assigned by it to any other entity or to the Association.  Any such assignment or transfer shall be made by appropriate instrument in writing duly recorded in the office of the Wayne County Register of Deeds.

Originally, the Bylaws—which were included with the Master Deed as Exhibit A—provided, in relevant part, as follows:

## ARTICLE VI

### RESTRICTIONS

\* \* \*

Section 2. **Leasing and Rental**.

(a) **Right to Lease**.  A Co-owner may lease his Unit for the same purpose set forth in Section 1 of this Article VI . . . .  The Developer may lease any number of Units in the Condominium in its discretion without approval by the Association.[1]

---

[1] Section 1 of Article VI provided that a unit may only be used for "single-family residence purposes."

* * *

## ARTICLE XXI

### RIGHTS TO THE DEVELOPER

> Any or all of the rights and powers granted or reserved to the Developer in the Condominium Documents or by law, including the right and power to approve or disapprove any act, use, or proposed action or any other matter or thing, may be assigned by it to any other entity or to the Association. Any such assignment or transfer shall be made by appropriate instrument in writing in which the assignee or transferee shall join for the purpose of evidencing its consent to the acceptance of such powers and rights and such assignee or transferee thereupon have the same rights and powers as herein given and reserved to the Developer. . . .

In September 2004, King/Inkster II mortgaged the condominium project to Ohio Savings Bank; the mortgage was subsequently assigned to AMT CADC Venture, LLC, in July 2010 and then to IOTA Dove's Brownstown, LLC ("IOTA") in January 2012. In July 2012, IOTA initiated foreclosure proceedings against King/Inkster II for defaulting on the mortgage. IOTA was the successful bidder at the foreclosure sale, and the condominium project was conveyed to IOTA by sheriff's deed in August 2012. In June 2013, plaintiff and IOTA entered into a purchase agreement whereby IOTA sold plaintiff its rights in the condominium project for $525,000. The condominium project was conveyed to plaintiff by covenant deed in October 2013. Although the covenant deed did not expressly transfer "developer rights" to plaintiff, IOTA separately executed a "Notice of Ownership Transfer Effective October 15, 2013" stating that the "Developer Rights" were transferred to plaintiff's management company, Infinity Homes & Co.

In June 2013, plaintiff purchased five partially built units and vacant parcels of land for 39 units scattered throughout the condominium project. The five partially built units were completed and eventually sold in about 2015. In 2018, the Association voted on a proposed "First Amendment to the Master Deed" that would amend Section 2 of the Bylaws to provide, in relevant part, as follows:

**Section 2. Leasing and Rental of Units.**

A. <u>Right to Lease</u>.

> (1) A Co-owner may only lease a Unit . . . if the Co-owner [has] . . . obtained the Board of Director's [sic] prior written approval as more fully set forth in this Section 2.

> (2) Except for those Units under an approved lease as of the effective date of the First Amendment to the Master Deed, the Board of Directors shall not grant approval if (1) the leasing of such Unit would result in any one person or entity (including affiliates or commonly owned entities) leasing more than 1 Unit at any given time, or (2) the leasing of such Unit would cause the total number of leased Units in the Condominium to exceed 10%. . . .

The First Amendment was ratified by the requisite two-thirds of Association voters and was recorded with the Wayne County Register of Deeds in October 2018. Plaintiff did not approve the First Amendment.

Plaintiff sued defendant that month, alleging that at the time it made its purchase in 2013, it anticipated possibly building the 39 units to lease but that it now could not do so under the First Amendment to Section 2. That is, according to plaintiff, while it could still actually build the 39 units, doing so would be futile because it would be unable to lease more than one of them under the First Amendment.[2] Plaintiff then filed this lawsuit, alleging in Count I that defendant breached the Master Deed by amending the Bylaws without its written consent and that it was damaged by the ongoing loss of anticipated lease revenue. In Count II, plaintiff alleged that defendant committed tortious inference with business expectancies and that it was damaged for the same reason. In Count III, plaintiff requested that the trial court enter a declaratory judgment providing "that Plaintiff has the right and power under the Master Deed to lease as many Units, at any given time, as it wishes."

The parties filed competing motions for summary disposition. In November 2019, the trial court decided the case by a 19-page opinion and order. First, the trial court held that plaintiff had standing to seek a declaratory judgment under MCR 2.605. Second, the trial court held that under Article III, Section 12 of the Master Deed, which defines "Developer" as King/Inkster II and its "successors and assigns," plaintiff was the "Developer" because it was a "successor" to King/Inkster II. In this regard, the trial court explained that IOTA purchased the condominium project at the foreclosure sale, the sheriff's deed conveyed "all right, title, and interest" to IOTA, and IOTA subsequently conveyed "all right, title, and interest" to plaintiff through the covenant deed. Third, the trial court held in the alternative that plaintiff qualified as a "successor developer" under MCL 559.235 of the Condominium Act, MCL 559.101 *et seq.*, and thus that it succeeded to King/Inkster II's contractual rights. Fourth, the trial court held that the First Amendment violated the Master Deed because Article VI, Section 2(a) of the Bylaws provided that "[t]he Developer may lease any number of Units in the Condominium," Article IX, Section 6 of the Master Deed provides that the Master Deed may not be amended "without the written consent of the Developer," and defendant purported to amend the Bylaws without obtaining the written consent of plaintiff. Fifth, the trial court held that plaintiff could not show damages for the breach of contract because "[p]laintiff's claimed damages are based on multiple business contingencies that may or may not happen in the future. In order to claim actual damages plaintiff would have to develop land, build the units, find and identify prospective lessees who have agreed to rent the Units." Sixth, the trial court held that plaintiff could not show damages for the tortious-interference claim for the same reason.[3] Accordingly, the trial court granted summary disposition in favor of defendant on Counts I and II, and with respect to Count III, awarded plaintiff a declaratory judgment providing that it was the "Developer" for the purposes of the Master Deed and that defendant breached Article IX,

---

[2] According to the March 2019 deposition testimony of plaintiff's manager, the market conditions for the sale of such units are poor (or at least the market was poor at the time). Thus, plaintiff could only maximize its profit by leasing the units.

[3] The trial court declined to address the remaining elements of tortious interference.

Section 6 of the Master Deed by not obtaining the written consent of plaintiff before purporting to amend the Bylaws.

This appeal followed.

## II. DOCKET NO. 351845

In Docket No. 351845, defendant argues that the trial court erred in ruling that plaintiff was the "successor" of King/Inkster II under the Master Deed, thereby succeeding to King/Inkster II's right under the Bylaws to lease an unlimited number of units that it owns. We disagree.[4]

"This Court reviews de novo a trial court's decision on a motion for summary disposition in an action for a declaratory judgment." *Lansing Sch Ed Ass'n, MEA/NEA v Lansing Bd of Ed (On Remand)*, 293 Mich App 506, 512-513; 810 NW2d 95 (2011). "[Q]uestions involving the proper interpretation of a contract or the legal effect of a contractual clause are also reviewed de novo." *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005).

The dispositive provision is found within Article III of the Master Deed, which defines "Developer."

> "Developer" means King/Inkster II, LLC, a Michigan limited liability company, which has made and executed this Master Deed, and its successors and assigns. Both successors and assigns shall always be deemed to be included within the term "Developer" whenever, however, and wherever such terms are used in the Condominium Documents.

The meaning of "successors and assigns" in this context is controlled by *Fed Nat'l Mort Ass'n v Lagoons Forest Condominium Ass'n*, 305 Mich App 258; 852 NW2d 217 (2014). In that case, a condominium unit was foreclosed upon because the owners defaulted on the mortgage. *Id*. at 260. In addition, the owners failed to pay association fees. *Id*. RBS Citizens Bank purchased the unit at the foreclosure sale and received a sheriff's deed; it subsequently transferred title to the unit to Fannie Mae by quitclaim deed. *Id*. at 261. Thereafter, the association filed a lien against the unit for the unpaid association fees that had accrued both before and after the foreclosure. *Id*. One of the issues before this Court was whether Fannie Mae could be liable for the earlier assessments or was exempt from liability under MCL 559.158, which provides as follows:

> If the mortgagee of a first mortgage of record or other purchaser of a condominium unit obtains title to the condominium unit as a result of foreclosure of the first mortgage, that mortgagee or purchaser and his or her *successors and assigns* are not liable for the assessments by the administering body chargeable to the unit that became due prior to the acquisition of title to the unit by that mortgagee or purchaser and his or her *successors and assigns*. [Emphasis added.]

---

[4] To be precise, we conclude that plaintiff is the "successor and assign" of King/Inkster II.

Specifically, the issue was whether Fannie Mae was a "successor and assign" of RBS Citizens Bank. See *Lagoons*, 305 Mich App at 265. This Court held that it was a "successor and assign" of RBS Citizens Bank, reasoning as follows:

> The statute does not define "successors and assigns." . . . *Black's Law Dictionary* (9th ed) defines "successor" as "one who replaces or follows a predecessor," and "successor in interest" as "[o]ne who follows another in ownership or control of property." Further, "assign" is defined by way of "assignee" as "[o]ne to whom property rights or powers are transferred by another." *Id*.

> Neither party disputes that RBS Citizens Bank acquired the sheriff's deed to the condominium as the result of a purchase pursuant to a foreclosure sale on March 1, 2011. Further, neither party disputes that Fannie Mae obtained its interest in the condominium as a result of a quitclaim deed granted by RBS Citizens Bank. Therefore, RBS Citizens Bank can properly be described as the "purchaser" and Fannie Mae can properly be described as its "successor and assign." Accordingly, pursuant to MCL 559.158, both RBS Citizens Bank and Fannie Mae were not liable for any assessments and fees that had accrued on the condominium before RBS Citizens Bank's purchase on March 1, 2011. [*Id*. at 265-266.]

The above analysis does not particularly identify whether Fannie Mae was a "successor," an "assign," or both, of RBS Citizens Bank. Nonetheless, it reasonably stands for the proposition that when title to real property is transferred from one entity to another entity, the latter entity becomes a "successor and assign," at least absent other statutory or contractual language compelling a different conclusion.

As applied here, plaintiff is a "successor and assign" of King/Inkster II because it obtained title to the condominium project through the covenant deed and the otherwise valid chain of title. Specifically, the August 2012 sheriff's deed to IOTA conveyed, in relevant part, as follows:

> (i) all contracts and other agreements, if any, relating to the sale, lease, brokerage, development, management, maintenance and/or operation of the Mortgaged Property (or any part thereof or interest therein) . . .

The October 2013 covenant deed between IOTA and plaintiff conveyed, in relevant part, as follows:

> *Together* with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion or reversions, remainder or remainders, rents, issues and profits thereof; and all the estate, right, title, interest, claim or demand whatsoever, of the Grantor, either in Law or Equity, of, in, and to the above bargained premises . . . [Emphasis in original.]

Thus, title to the condominium project was conveyed from King/Inkster II to IOTA, and from IOTA to plaintiff. Plaintiff is therefore a "successor and assign" of King/Inkster II.[5]

Further, the fact that plaintiff was not a direct "successor and assign" of King/Inkster II is not of importance. The Master Deed refers to "Developer" as a singular entity, thus contemplating that at any given time, there only will be one "Developer." But Article III, Section 12 of the Master Deed refers to "successors and assigns" in the plural, thus contemplating that there may be more than one "successor and assign." It logically follows that a "successor and assign" need not obtain its title directly from King/Inkster II. Otherwise, the Master Deed would use those words in the singular, not the plural.

For these reasons, we conclude that plaintiff is the "successor and assign" of King/Inkster II under Article III, Section 12 of the Master Deed.[6] Having so concluded, it is then necessary to address whether the trial court erred in ruling that defendant breached the Master Deed by adopting the First Amendment without the written consent of plaintiff.

Once again, plaintiff was the "successor and assign" to King/Inkster II, which established it as the "Developer" under the Master Deed and Bylaws. See Article III, Section 12 of the Master Deed ("Both successors and assigns shall always be deemed to be included within the term 'Developer' whenever, however, and wherever such terms are used in the Condominium Documents."). Plaintiff therefore possessed the right under the Bylaws to lease any number of

---

[5] Defendant argues that a "successor" corporation must succeed to *all* of the predecessor corporation's interests, and observes that in this case, none of the alleged "successors" succeeded to all of King/Inkster II's interests. This argument is not without force, see *Bd of Managers of Medinah on Lake Homeowners Ass'n v Bank of Ravenswood*, 295 Ill App 3d 131, 136; 692 NE2d 402 (1998), but we must nonetheless follow and apply the decisions of this Court.

[6] We acknowledge defendant's argument that "developer rights" may only be transferred by specific language, at least under the law of some other states. See, e.g., *Scott v Ranch Roy-L, Inc*, 182 SW3d 627, 633 (Mo Ct App, 2005) ("[T]he developer's rights of a platted subdivision are personal rights that do not run with the land. Since the warranty deed did not contain a specific assignment of those rights as the developer of the Subdivision, such rights were not conveyed by the general language of the habendum clause of the deed."). Assuming that the right to lease an unlimited number of units under the Bylaws is one such "developer right," we nonetheless need not reach that question today because the Master Deed definition of "Developer" is controlling. If the Master Deed did not specifically define "Developer" as including "successors and assigns," it would then become necessary to address whether and how an original developer may transfer its "developer rights" to a subsequent entity.

Further, because we conclude that plaintiff is the "successor and assign" of King/Inkster II under the Master Deed, we need not reach the question of whether the trial court erred in ruling that plaintiff is the "successor developer" of King/Inkster II under MCL 559.235 or whether such a statutory "successor developer" necessarily inherits all of the contractual "developer rights" of the original developer. Particularly with regard to the latter argument, however, we respectfully note our disagreement with plaintiff that defendant's position is "illogical" and "absurd."

units. See Article VI, Section 2(a) of the Bylaws ("The Developer may lease any number of Units in the Condominium in its discretion without approval by the Association."). Further, under Article IX, Section 6 of the Master Deed, as interpreted by the parties,[7] the Bylaws cannot be amended "without the written consent of the Developer so long as the Developer continues to offer any Unit in the Condominium for sale or for so long as there remains, under such provisions, any further possibility of expansion of the Condominium Project."[8] Defendant therefore breached the Master Deed by attempting to amend the Bylaws without the written consent of plaintiff, and the trial court did not err by entering a declaratory judgment to that effect.

## III. DOCKET NO. 351827

In Docket No. 351827, plaintiff argues that the trial court erred in ruling that its damages were speculative and dismissing its breach-of-contract and tortious-interference claims on that basis. We agree.

"This Court reviews de novo a trial court's decision with respect to a motion for summary disposition." *Village of Dimondale v Grable*, 240 Mich App 553, 563; 618 NW2d 23 (2000). "Summary disposition is appropriate under [MCR 2.116(C)(10)] if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Spectrum Health Hospitals v Mich Assigned Claims Plan*, 330 Mich App 21, 30; 944 NW2d 412 (2019) (quotation marks and citation omitted).

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014).[9] "The measure of damages in relation to a breach of contract is the pecuniary

---

[7] The parties do not dispute that Article IX of the Master Deed prohibits amendments of the Bylaws without the written consent of the Developer. However, we note that Article IX of the Master Deed applies to amendments of "[t]his Master Deed and the Condominium Subdivision Plan (Exhibit B to said Master Deed)."

[8] Defendant does not dispute that plaintiff either "continues to offer any Unit in the Condominium for sale" or that there remains "any further possibility of expansion of the Condominium Project."

[9] The elements of tortious interference with a business expectancy are as follows:

> (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted. [*Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 90; 706 NW2d 843 (2005).]

Thus, damages are an element of both claims maintained by plaintiff. And although the measure of damages differs between tort and contract, see *Corl v Huron Castings, Inc*, 450 Mich 620, 628-

value of the benefits the aggrieved party would have received if the contract had not been breached." *Doe v Henry Ford Health Sys*, 308 Mich App 592, 601; 865 NW2d 915 (2014) (quotation marks and citation omitted). "The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). "Damages must not be conjectural or speculative in their nature, or dependent upon the chances of business or other contingencies." *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 551; 904 NW2d 192 (2017) (cleaned up).

However, "damages need not be fixed with precision to be recovered and that a defendant cannot escape liability by making the determination of damages impossible." *Home Ins Co v Commercial & Indust Sec Servs, Inc*, 57 Mich App 143, 147; 225 NW2d 716 (1974). "[W]hile some uncertainty as to the amount of damages is allowable, uncertainty as to the fact of the amount of damage caused by the breach of contract is fatal[.]" *Id*. "Lost profits, if properly proven, are an appropriate element of damages." *Body Rustproofing, Inc v Mich Bell Tel Co*, 149 Mich App 385, 390; 385 NW2d 797 (1986). "Before lost profits are recoverable, they must be proven with a reasonable degree of certainty as opposed to being based on mere conjecture or speculation." *Id*.

The First Restatement of Contracts explains the degree of certainly required to establish lost profits:

> (1) Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.

> (2) Where the evidence does not afford a sufficient basis for a direct estimation of profits, but the breach is one that prevents the use and operation of property from which profits would have been made, damages may be measured by the rental value of the property or by interest on the value of the property. [Restatement of Contracts 1st, § 331.]

We agree with plaintiff that it was allegedly damaged by the First Amendment. At a minimum, because plaintiff had to delay—and, possibly, is continuing to delay—building its units for lease, it allegedly suffered damages by the loss of lease income. In other words, if plaintiff had built the units in 2018 as it intended, then it could have potentially leased some or all of those units for the past few years and received income in that regard. This alleged loss of lease income is essentially

---

629; 544 NW2d 278 (1996), in both instances damages may not be speculative. See *4041-49 W Maple Condo Ass'n v Countrywide Home Loans, Inc*, 282 Mich App 452, 460; 768 NW2d 88 (2009) ("Remote, contingent, or speculative damages cannot be recovered in Michigan in a tort action."); *Device Trading Ltd v Viking Corp*, 105 Mich App 517, 526; 307 NW2d 362 (1981) (explaining that contract damages "are not recoverable where they are remote, speculative, contingent, or not the result of the injury"). Because most of the pertinent caselaw discussing speculative damages involves breach of contract, we rely on that caselaw for both claims at issue in this case.

"lost profits" and is a cognizable form of damages. See *Body Rustproofing*, 149 Mich App at 390.[10]

Defendant does not challenge the fact that plaintiff theoretically lost lease income during the past few years. Instead, defendant argues, and the trial court agreed, that damages were "speculative" because the units had not yet been built and there were no potential lessees. We respectfully disagree. The alleged damages here are no less speculative than other "lost profit" cases in which courts have allowed claims to proceed. For example, in *Fera v Village Plaza, Inc*, 396 Mich 639; 242 NW2d 372 (1976), the plaintiffs planned to open a " 'book and bottle' shop" in a particular shopping center and executed the appropriate lease. *Id.* at 641. The landlord, however, ultimately violated the lease and refused to allow the plaintiffs to occupy the leased premises. *Id.* at 642. Our Supreme Court held that the plaintiffs' claim for lost profits was properly submitted to the jury, explaining that the lost profits were sufficiently proven by experts who were familiar with the plaintiff's business model and understood the amount of likely profits for the shop. *Id.* at 645-646. If the plaintiffs in *Fera* were not required to show actual customers or build the business itself, then it follows that plaintiff here should not be required to show potential lessees or build the units themselves.

Similarly, in *Merkur Steel Supply Inc v Detroit*, 261 Mich App 116; 680 NW2d 485 (2004), the plaintiff sought lost profits for the city's refusal to allow it to construct a building to expand its business. *Id.* at 136. This Court held that the city was liable for a "taking" in this regard, and then held that the lost profits were not speculative:

> Furthermore, the evidence was not unduly speculative. Plaintiff wanted to build a new building in order to expand its business. It must be kept in mind that plaintiff wished to utilize a portion of its property that was vacant. The jury in this case visited the property site and heard testimony from several witnesses regarding plaintiff's plans to expand. Plaintiff's owners testified regarding the new operations that would be conducted in the new building as an extension of the existing operation. Plaintiff's expert witness testified regarding prices and costs. Plaintiff's president and vice-president of finance testified regarding the profitability of the expansion and the profitability of the existing business and gave specific dollar amounts. Plaintiff's financial statements were also entered into evidence, as were its tax returns. Moreover, the jury was instructed that it should not speculate. . . . Because we are dealing with a business that has not come to fruition, some degree of guesswork is necessary and the amount of damages cannot be established for certain. [*Id.* at 136-137.]

---

[10] Plaintiff also argued that it suffered other incidental damages, such as maintenance of the vacant lots, for the past few years. Such alleged damages are inherently intertwined with the claim for lost profits, however. In other words, to show the total amount of lost profits, plaintiff must show not only the amount of lost lease income, but also the costs that it would have incurred and the costs that it has actually incurred. Regardless, we note that "nominal damages are generally sufficient to sustain a cause of action." *4041-49 W Maple Condo Ass'n*, 282 Mich App at 460.

The *Merkur* plaintiff, as with the *Fera* plaintiffs, sought damages for lost profits arising from a business that was not constructed. We discern little difference between those cases and the instant case, where plaintiff seeks lost profits from lessees instead of ordinary customers, and where plaintiff has apparently not yet built the units at issue.

Simply put, this Court and our Supreme Court have recognized that claims for lost profits are not unduly speculative even when the business at issue has not been constructed and there are no actual customers. Thus, the trial court's reasoning that plaintiff's alleged damages were "purely speculative" because it had not yet built the units or identified potential lessees was incorrect. Of course, plaintiff may not actually be able to establish the amount of lost profits, or even whether it was damaged at all, but at this stage of the proceedings, the trial court prematurely dismissed its claims on the basis that the alleged damages suffered were speculative.[11]

## IV. CONCLUSION

In Docket No. 351845, we affirm the trial court's ruling that defendant breached the Master Deed and declaratory judgment to that effect. However, in Docket No. 351827, we reverse the trial court's ruling that plaintiff's damages were speculative, and remand to that court for further proceedings consistent with our opinion. We do not retain jurisdiction.

/s/ Amy Ronayne Krause
/s/ Michael J. Riordan
/s/ Colleen A. O'Brien

---

[11] Nothing in our opinion today should be understood as expressing agreement or disagreement with plaintiff's assertion that its damages are ongoing because defendant elected to appeal an adverse decision.